IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO.: 16-1874

DURANT TISDALE,
Plaintiff-Appellant,

v.

CITY OF PHILADELPHIA, POLICE
OFFICER TIMOTHY GIBSON, AND
POLICE OFFICER DAVID
SHERWOOD
Defendants-Appellants

---

ON APPEAL FROM THE GRANTING OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT IN THE UNITED STATES DISTRICT COURT
FOR THE EASTER DISTRICT OF PENNSYLVANIA AT NO.: 15-CV-5209

---

APPENDIX OF PLAINTIFF APPELLANT, DURANT TISDALE
VOLUME 1
A1-A120

---

Submitted by:
Michael I. McDermott, Esquire
Attorney for Plaintiff-Appellant
ID# 52917
1026 Winter Street
Suite 200
Philadelphia, PA 19107
(215) 925-9732

# **TABLE OF CONTENTS**

NOTICE OF APPEAL...................................................................................A 1-2

ORDER IN QUESTION WITH OPINION....................................................A 3-6

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS...............................A 7-9

PLAINTIFF'S ANSWER TO DEFENDANTS' STATEMENT OF UNDISPUTED
FACTS...........................................................................................................A 10-15

PLAINTIFF'S DEPOSITION TRANSCRIPT..................................................A 16-67

OFFICER TIMOTHY GIBSON'S DEPOSITION TRANSCRIPT........................A 68-118

BRENDA LEE INTERVIEW............................................................................A 119

BIOGRAPHICAL INFORMATION REPORT....................................................A 120

## IN THE UNITED STATES DISTRICT COURT OF APPEAL
### EASTERN DISTRICT OF PENNSYLVANIA

DURANT T. TISDALE,
    Plaintiff
    vs.

THE CITY OF PHILADELPHIA,
POLICE OFFICER TIMOTHY GIBSON, and
POLICE OFFICER DAVID SHERWOOD
    Defendants

:   CIVIL ACTION
:   No. 2:15-CV-05209
:
:
:
:
:
:
:

### NOTICE OF APPEAL

Plaintiff, Durant T. Tisdale, hereby appeal to the United District Court of Appeal of the

third Circuit from the Order (Doc. 23: Order of Motion for Summary Judgment ) entered in this

action on the 11th day of March, 2016. This order has been entered in the docket as evidenced by

the attached copy of the docket entry.

_Michael I. McDermott_
Michael I. McDermott, Esquire
Identification No.: 52917
Attorney for Petitioner,
Durant T. Tisdale
1026 Winter Street
Suite 200
Philadelphia, PA. 19107
(215) 925-9732

Date: April 8, 2016

A-1

## IN THE UNITED STATES DISTRICT COURT OF APPEAL
## EASTERN DISTRICT OF PENNSYLVANIA

DURANT T. TISDALE,                              :     CIVIL ACTION
    Plaintiff                 :     No. 2:15-CV-05209
    vs.                       :
                              :
THE CITY OF PHILADELPHIA,                       :
POLICE OFFICER TIMOTHY GIBSON, and              :
POLICE OFFICER DAVID SHERWOOD                   :
    Defendants                :

### CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2016, a copy of the foregoing was filed electronically. Notice of the filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the court's system:

Service by electronic filing to:

        Aaron Shotland, Esquire
        Assistant City Solicitor
        City of Philadelphia Law Department
        1515 Arch Street
        5th Floor,
        Philadelphia, PA 19102

        Michael I. McDermott, Esquire
        Attorney Identification No.: 52917
        Attorney for Plaintiff
        Durant T. Tisdale
        1026 Winter Street
        Suite 200
        Philadelphia, PA 19107
        (215) 925-9732

Date: April 8, 2016

A 2

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DURANT T. TISDALE ,<br>            Plaintiff, | CIVIL ACTION |
| v. | |
| THE CITY OF PHILADELPHIA, POLICE<br>OFFICER TIMOTHY GIBSON, AND<br>POLICE OFFICER SHERWOOD,<br>            Defendants. | NO. 15-5209 |

### ORDER

**AND NOW,** this 10th day of March, 2016, upon consideration of Defendants' Motion

For Summary Judgment (ECF No. 19), Plaintiff's Response thereto (ECF No. 20), and

Defendants' Reply (ECF No. 21), it is **HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment is **GRANTED** as to the City of
   Philadelphia; all claims (Counts I and II) against the City of Philadelphia are
   **DISMISSED WITH PREJUDICE;**[1]

2. Defendants' Motion for Summary Judgment is **GRANTED** as to Count III of the
   Amended Complaint against Police Officers Timothy Gibson and David
   Sherwood; Count III is **DISMISSED WITH PREJUDICE;**[2]

---

[1] Defendant, the City of Philadelphia argues, and the Plaintiff concedes, that pursuant to *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978) and its progeny summary judgment should be granted with respect to Plaintiff's claims that the City was deliberately indifferent to violations of his civil rights.

[2] Count III of Plaintiff's Amended Complaint consists of claims under 42 U.S.C. § 1983 for false arrest and malicious prosecution. As a preliminary matter, the record evidence is that Detective Sherwood was not involved in the arrest or the probable cause decision -- thus the claims against him must be dismissed.

The disposition of the Fourth Amendment claims against Officer Gibson turns on whether he had probable cause to arrest Tisdale. *Montgomery v. DeSimone*, 159 F.3d 120, 124 (3d Cir. 1998) (requiring plaintiff to establish an absence of probable cause to prevail on her Section 1983 malicious prosecution claim). The analysis starts with the Fourth Amendment prohibition on a police officer from arresting a citizen without probable cause. *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000). Probable cause to arrest exists when an officer has information at the time of the arrest sufficient to lead a reasonable enforcement officer to believe that an offense has been

A3

committed by the person to be arrested. *Id.* (citation omitted). It is a fluid concept the determination of which turns on the assessment of the facts in a given situation. *Id.* (citation omitted). The analysis must take into account the fact that an officer in considering a warrantless arrest determines whether there is probable cause "on the spot" and under pressure. *Id.* (citation omitted). Thus, the Court must take a common sense approach and determine the existence of probable cause based on the "totality of the circumstances." *Id.* (citation omitted).

The undisputed facts here are that on the night of July 5, 2013 a person by the name of Brenda Lee called 911 to report the theft of a grate from the basement window of her neighbor's house. The thief, she said, had placed the grate in a shopping cart. She told the 911 operator that the person she saw taking the grate was wearing a white baseball hat turned backwards, a black shirt and black pants – information which was provided by radio to Police Officer Timothy Gibson who was on duty with his partner in a squad car.

Meanwhile, Lee followed the suspect in her car and stayed on the phone with the 911 operator. When the parties – Lee, Tisdale and the officers in the squad car – converged at another location Lee positively identified Tisdale as the person who she saw taking the grate from a basement window.

All agree that at the time of his arrest, Tisdale did not have the grate, a shopping cart and/or any tools on or/about his person and that Lee could not later tell the police where the grate and shopping cart were. Tisdale told police that he did not take the grate; that he was on parole and didn't want any trouble; and that he was on his way home from work. The police searched the area and did not find the grate and/or the shopping cart.

There is some dispute about what Tisdale was wearing at the time of the arrest. Gibson testified that he was wearing a black shirt and white hat, matching the flash description of the suspect received over the radio. Tisdale controverts this testimony: He says that at the time of his arrest he was wearing his Philadelphia Phillies work uniform, which consisted of a blue baseball cap with a red P on the front and his uniform shirt, a darker gray polo shirt emblazoned with the Phillies logo. While he does not dispute that a photo taken of him at the police station after the arrest show him wearing a black t-shirt, he says he changed his Phillies shirt for a black t-shirt (which he had with him in a book bag at the time of his arrest) after a night spent in a holding cell.

A positive identification of a perpetrator by a witness to a crime is usually sufficient to establish probable cause. *Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000) (citation omitted). However, this precept is not absolute: where the officer knows of "[i]ndependent exculpatory evidence" or there is "substantial evidence of the witness's own unreliability" that evidence could outweigh the identification such that probable cause does not exist. *Id.* (citation omitted). Plaintiff's arguments suggest (without specifically addressing the matter head on) that both such circumstances exist here.

Plaintiff argues that the information provided by Lee to the police is suspect because although she says she followed the suspect in her car, she could not tell the officers the location of the grate and cart and they could not find it. Those facts, however, are not relevant to the issue of whether the officers had probable cause to arrest. The location of the grate and the cart had no bearing on their decision to arrest. That decision was based off the flash information given over the police radio describing what the perpetrator looked like and what he was wearing, Joint Appendix ("JA") 67-68, 75, 86 (Gibson Dep.) & 148-49 (Whittaker Dep.), and on Lee's positive identification of Tisdale, JA 17 (Tisdale Dep.) ("A woman pulled up. The police officer pulled up second behind

2

A 4

3.  The Court declines to exercise supplemental jurisdiction over the Plaintiff's state

    law claims; accordingly, they are **DISMISSED** pursuant to 28 U.S.C. § 1367(c);

4.  The Clerk of Court is directed to close this case.


**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**


her. She got out of the car and she pointed in my direction and said, 'That's him.'"),

The Plaintiff next suggests that the differing accounts of what he was wearing -- she said, a white baseball hat, a black shirt and black pants; he said, a blue baseball hat and a darker gray Phillie's polo shirt -- undercuts her positive identification. However, as in the case of *Wilson*, the strongest inculpatory evidence is the positive identification. In that case, although the eyewitness had described the robber as someone standing 6' 3" to 6' 5" tall, she subsequently positively identified a man who was four to seven inches shorter. Nevertheless, the Third Circuit found that "this indication of unreliability does not, from the vantage point of the arresting officer, fatally undermine the forceful positive identification." *Id.* at 791. Similarly, in *Sharrar v. Felsing*, where a victim had provided the name of her assailant in a 911 call and then identified a person with a different name which person was arrested, the Third Circuit found that the officer had probable cause to arrest him. 128 F.3d 810, 818 (3d Cir. 1997). Here, as in *Sharrar*, the officer received information from an eye witness who it seemed reasonable to believe was telling the truth. Thus, from a careful consideration of the applicable law and the evidence of record, the Court concludes that there is no genuine issue of material fact from which a jury could find that Officer Gibson did not have probable cause to arrest.

3

*A5*

4

A6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DURANT TISDALE, | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| v. | : | **No. 15-5209** |
| | : | |
| CITY OF PHILADELPHIA et al. | : | |
| | : | |
| **Defendants.** | : | |

### DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

1. Brenda Lee called the police and reported the theft of a window grate from her neighbor's house at 2216 Delhi St on July 5, 2013. Complaint/Incident Report, p. 1 and Lee Interview, p.6.

2. Brenda Lee followed the suspect in her car and stayed on the phone with the 911 operator. Lee Interview, p.6.

3. Police Officer Timothy Gibson, while working in full uniform and operating a marked police vehicle, received a radio call for a theft in progress from 2200 Delhi St committed by a black male wearing a black shirt and white hat. Gibson Interview, p. 5.

4. Upon arriving at 1000 Arizona St., Officer Gibson observed Durant Tisdale and Brenda Lee, and Lee identified Tisdale as the offender who took a white grate from a basement window.  Plaintiff's Deposition Transcript, p. 17:2-18:2, and p. 21:12-22:24, Complaint/Incident Report, p. 1 and Lee Interview, p.6.

5. Durant Tisdale at that time, was wearing a black shirt and white hat, matching the flash description of the suspect. Gibson Deposition Transcript p. 86:15-86:21.

6. As a result of Brenda Lee's positive identification of Durant Tisdale, Police Officer Gibson placed Durant Tisdale under arrest.   Police Officer Gibson's Deposition Transcript, p. 63:18-64:13.

7. Brenda Lee was transported to East Detectives, where she was interviewed by Detective David Sherwood at 12:00am on July 6, 2013 and again implicated Durant Tisdale in the attempted theft of a window grate. Det. Sherwood Deposition Transcript, p. 107: 20-108:21 and Lee Interview, p. 6.

8. Detective David Sherwood also interviewed Police Officer Gibson at 12:30am on July 6, 2013. Officer Gibson stated that while operating a marked police vehicle with Police Officer Whittaker, they received a radio call of a theft in progress from 2200 Delhi St and a flash report of a black male wearing a black shirt and white hat last seen in the area of 10th and Dakota. The officers surveyed the area and observed both Brenda Lee and Durant Tisdale. Brenda Lee stated to police that she observed Durant Tisdale take a white grate from the basement window of 2220 Delhi St. Brenda Lee assisted Officer Gibson in contacting the owner of the property, Brian Stewart by cell phone. Gibson Interview, p. 5.

9. Detective David Sherwood then gathered all of the information provided by the officers and Ms. Lee, and submitted it to the District Attorney to make a decision on whether to charge Durant Tisdale. Det. Sherwood Deposition Transcript, p. 122:20-123:6

10. Detective David Sherwood had no involvement in the physical arrest of Plaintiff. His only involvement in this matter is he interviewed Police Officer Gibson and witness Brenda Lee, and prepared a Police Arrest Report ("PARS"). Sherwood Deposition Transcript, 106:11-106:16.

Respectfully submitted,

Date:  January 29, 2016 _____          ___ /s/ Aaron Shotland_
                                         Aaron Shotland
                                         Pa. Attorney ID No. 205916
                                         City of Philadelphia Law Department
                                         1515 Arch Street, 14th Floor
                                         Philadelphia, PA 19102
                                         (215) 683-5434
                                         aaron.shotland@phila.gov

A-9

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DURANT TISDALE | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | NO.: 15-cv-5209 |

## PLAINTIFF'S ANSWER TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiff, Durant Tisdale, by and through his counsel, Michael I. McDermott, Esquire, hereby answers Defendants' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment, and in support thereof, avers as follows:

1. Admitted with clarification. By way of further answer, Brenda Lee told the police that she remained on the phone with the 911 operator and followed the plaintiff, Durant Tisdale and was still following him when she met the police at intersection of 11th and Arizona Streets, Philadelphia, PA. Ms. Lee could not tell the police where the grate and shopping cart where located. Lee interview, P.7. Neither the grate and/or shopping cart were recovered despite the police searching the area. Complaint/Incident Report, P.1.

2. Admitted with clarification. By way of further answer, Brenda Lee told the police that she remained on the phone with the 911 operator and followed the plaintiff, Durant Tisdale and was still following him when she met the police at the intersection of 11th and Arizona Streets, Philadelphia, PA. Ms. Lee could not tell the police where the grate and shopping cart where located. Lee interview, P.7. Neither the grate and/or shopping cart were recovered despite the police searching the area. Complaint/Incident Report, P.1.

Police Officer Timothy Gibson testified that the plaintiff did not have the grate, a shopping cart and/or any tools on or/about his person. Gibson Deposition Transcript, P. 24. Officer Gibson further testified that he never asked the witness, Brenda Lee what the plaintiff did with the grate and shopping cart. Gibson Deposition Transcript, p. 26. Police Officer Robert Whitaker never asked the witness, Brenda lee what the plaintiff did with the grate and shopping cart. Whitaker Deposition Transcript, p. 9. Philadelphia Detective David Sherwood did not ask the witness, Brenda Lee what the plaintiff did with the grate and shopping cart. Sherwood Deposition Transcript, p. 11.

3.  Admitted with clarification. By way of further answer, Brenda Lee described the plaintiff as wearing a white baseball hat turned backwards, black shirt and black pants. Lee interview, P.7. The Philadelphia Police Department Biographical Information Report does not have a clothing description filled out in reference to the plaintiff. Biographical Information Report. P.6.

4.  Admitted with clarification. By way of further answer, Brenda Lee described the plaintiff as wearing a white baseball hat turned backwards, black shirt and black pants. Lee interview, P.7. The Philadelphia Police Department Biographical Information Report does not have a clothing description filled out in reference to the plaintiff. Biographical Information Report. P.6. The plaintiff testified that at the time of his arrest at the intersection of 11th and Arizona Streets, Philadelphia, PA; he was wearing his Philadelphia Phillies work uniform, which consisted of a blue baseball cap with a red P on the front and his uniform shirt, a polo shirt with the Phillies emblem. Plaintiff changed his shirt prior to the arrest photo being taken because he was sleeping on the dirty floor of

the holding cell and that is why he was in the black t-shirt in his arrest photo. Plaintiff's Deposition Transcript, p. 18:1-20:6.

5.  Admitted with clarification. By way of further answer, Police Officer Timothy Gibson did not recover the grate and/or the shopping cart that plaintiff Durant Tisdale allegedly used to transport the grate. The police questioned plaintiff Tisdale and he responded that he didn't take and/or have the grate; that he was on parole and didn't want any trouble; and that he was on his way home from work. The police searched the area and did not find the grate and/or the shopping cart. Plaintiff's Deposition Transcript, p. 16: 9-17. Despite this lack of evidence, Police Officer, Gibson arrested the plaintiff placed him in custody.

6.  Admitted with clarification. By way of further answer, Brenda Lee told the police that she remained on the phone with the 911 operator and followed the plaintiff, Durant Tisdale and was still following him when she met the police at the intersection of 11th and Arizona Streets, Philadelphia, PA. Ms. Lee could not tell the police where the grate and shopping cart where located. Lee interview, P.7. Neither the grate and/or shopping cart were recovered despite the police searching the area. Complaint/Incident Report, P.1. Police Officer Timothy Gibson testified that the plaintiff did not have the grate, a shopping cart and/or any tools on or/about his person. Gibson Deposition Transcript, P. 24. Officer Gibson further testified that he never asked the witness, Brenda Lee what the plaintiff did with the grate and shopping cart. Gibson Deposition Transcript, p. 26. Police Officer Robert Whitaker never asked the witness, Brenda lee what the plaintiff did with the grate and shopping cart. Whitaker Deposition Transcript, p. 9. Philadelphia Detective

David Sherwood did not ask the witness, Brenda Lee what the plaintiff did with the garate and shopping cart. Sherwood Deposition Transcript, p. 11.

7. Admitted with clarification. By way of further answer, Brenda Lee told the police that she remained on the phone with the 911 operator and followed the plaintiff, Durant Tisdale and was still following him when she met the police at the intersection of 11th and Arizona Streets, Philadelphia, PA. Ms. Lee could not tell the police where the grate and shopping cart where located. Lee interview, P.7. Neither the grate and/or shopping cart were recovered despite the police searching the area. Complaint/Incident Report, P.1. Philadelphia Detective David Sherwood did not ask the witness, Brenda Lee what the plaintiff did with the grate and shopping cart. Sherwood Deposition Transcript, p. 11.

8. Admitted with clarification. By way of further answer, Brenda Lee described the plaintiff as wearing a white baseball hat turned backwards, black shirt and black pants. Lee interview, P.7. The Philadelphia Police Department Biographical Information Report does not have a clothing description filled out in reference to the plaintiff. Biographical Information Report. P.6. The plaintiff testified that at the time of his arrest at the intersection of 11th and Arizona Streets, Philadelphia, PA; he was wearing his Philadelphia Phillies work uniform, which consisted of a blue baseball cap with a red P on the front and his uniform shirt, a polo shirt with the Phillies emblem. Plaintiff changed his shirt prior to the arrest photo being taken because he was sleeping on the dirty floor of the holding cell and that is why he was in the black t-shirt in his arrest photo. Plaintiff's Deposition Transcript, p. 18:1-20:6.

9. Denied. To the contrary, the plaintiff was arrested and placed in custody at the intersection of 11th and Arizona Streets, Philadelphia, PA. Gibson Deposition Transcript, p. 11.

10. Admit.

Respectfully submitted:

*Michael I. McDermott*

Michael I. McDermott, Esquire
Identification No.: 52917
Attorney for Plaintiff
1026 Winter Street, Suite 200
Philadelphia, PA 19107
(215) 925-9732

Date: February 19, 2016

A-15

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CIVIL TRIAL DIVISION

- - -

DURANT T. TISDALE,            :   CIVIL ACTION
      Plaintiff,           :
                    :
      vs.                  :
                    :   NO. 15-5209
THE CITY OF PHILADELPHIA:
LAW DEPARTMENT, et al., :
      Defendants.          :



- - -

        Oral Deposition of DURANT T. TISDALE,

held in the offices of CITY OF PHILADELPHIA LAW

DEPARTMENT, One Parkway Building, 1515 Arch Street,

14th Floor, Philadelphia, Pennsylvania, on

Friday, January 8, 2016, beginning at 1:49 p.m.,

before DONNA M. RAY, Registered Professional

Reporter and Certified Court Reporter.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters & Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

**DURANT T. TISDALE**

```
 1    APPEARANCES:

 2

 3    BY:   MICHAEL I. McDERMOTT, ESQUIRE
       1026 Winter Street, Suite 200
 4    Philadelphia, Pennsylvania  19107
       (215) 925-9732
 5    Counsel for Plaintiff

 6

 7    CITY OF PHILADELPHIA
       LAW DEPARTMENT
 8    BY:  AARON SHOTLAND, ESQUIRE
       One Parkway Building
 9    1515 Arch Street
       14th Floor
10    Philadelphia, Pennsylvania  19102
       (215) 683-5434
11    Counsel for Defendants

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**DURANT T. TISDALE**

```
 1                    I N D E X

 2
    WITNESS
 3
    DURANT T. TISDALE
 4
        EXAMINATION                              PAGE
 5
        By:  Mr. Shotland                          4
 6      By:  Mr. McDermott                        36

 7

 8

 9

10                        -  -  -

11                  E X H I B I T S

12  EXHIBIT NO.    DESCRIPTION   PAGE FIRST REFERENCED

13             (No Exhibits Were Marked.)

14                        -  -  -

15

16

17

18

19

20

21

22

23

24
```

**DURANT T. TISDALE**

```
 1                    (It is stipulated by and among
 2    counsel for the respective parties that signing,
 3    sealing, certification and filing are waived and
 4    that all objections, except as to the form of the
 5    question, are reserved until the time of trial.)
 6                        - - -
 7                    DURANT T. TISDALE, having been first
 8              duly sworn, was examined and testified as
 9              follows:
10                        - - -
11                    EXAMINATION
12                        - - -
13    BY MR. SHOTLAND:
14        Q.    Good afternoon, Mr. Tisdale.  My name is
15    Aaron Shotland, and I represent the defendant --
16    all the defendants in this case, the police
17    officers and the City of Philadelphia.
18                    What you're here for today is called
19    a deposition.  Have you ever been deposed before?
20        A.    I don't understand.
21        Q.    So what we're here for is a deposition,
22    which is, essentially, an interview.  I'm going to
23    be asking you questions.  You'll answer the
24    questions.  The court reporter here is writing down
```

DURANT T. TISDALE

1   everything that we both say.

2          Have you ever gone through this

3   process before?

4      A.   No.

5      Q.   Okay.  I'm going to give you some

6   instructions so things go a little bit more

7   smoothly than otherwise.

8          Because she's writing down

9   everything, we want to not talk over each other.

10  So try to wait until I'm finished asking the

11  question before you begin to answer.

12          Do you understand?

13     A.   Yes, I understand.

14     Q.   A lot of times in conversation if you know

15  the answer to a question even before someone is

16  finished asking it you'll answer it, but that

17  doesn't work in this setting because she's writing

18  everything down.

19          Okay?

20     A.   Yes.

21     Q.   Also, you need to keep your answers

22  verbal.  So you're doing fine so far, but make sure

23  that you give a verbal answer as opposed to a nod

24  or shake of the head and try not to demonstrate

**DURANT T. TISDALE**

1    anything with your body.  Try to use your words as

2    much as possible so that the record is clear as to

3    kind of what you're trying to express.

4         A.   Okay.

5         Q.   If you don't understand a question, let me

6    know and I'll rephrase it.  If you answer the

7    question, I'm going to assume that you understood

8    it.

9              Do you understand?

10        A.   Yes.

11        Q.   Have you taken any medications today that

12   would prevent you from testifying honestly or

13   accurately?

14        A.   No.

15        Q.   Are you on any medications at all?

16        A.   Yes.

17        Q.   What are you on currently?

18        A.   Blood thinners and high blood pressure

19   medication.

20        Q.   Would either of those medications affect

21   your ability to testify honestly or accurately?

22        A.   No.

23        Q.   Okay.  How are you feeling today?

24        A.   Fine.

**DURANT T. TISDALE**

1      Q.    All right.  Good to hear.

2                  Can you state and spell your name

3   for the record?

4      A.    Yes.  My name is Durant Tisdale.  Durant

5   is spelled D-U-R-A-N-T.  Tisdale is spelled

6   T-I-S-D-A-L-E.

7      Q.    Do you have a middle name?

8      A.    Yes.

9      Q.    What is your middle name?

10     A.    Tyrone.

11     Q.    What is your date of birth?

12     A.    7/2/60.

13     Q.    What is your Social Security number?

14     A.    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.

15     Q.    Where do you currently live?

16     A.    I'm currently residing at 1242 West

17  Allegheny Avenue in Philadelphia, PA, 19133.

18     Q.    How long have you lived on West Allegheny?

19     A.    I've been there roughly about three weeks

20  now.

21     Q.    Just moved?

22     A.    Yes.

23     Q.    Where did you live prior to West

24  Allegheny?

**DURANT T. TISDALE**

1     A.   I was at 3950 North D Street.

2     Q.   How long were you there?

3     A.   About nine months.

4     Q.   We're here for an incident which occurred

5   back in 2013, July 6th.

6             Where did you live on that day?

7     A.   2341 North 20th Street.

8     Q.   When did you move there?

9     A.   I moved there -- if I'm not mistaken, it

10  was December of 2012.

11    Q.   When did you move out of there?

12    A.   Well, I got arrested in July.  So when I

13  got arrested being that I'm -- was on state parole,

14  they put a detainer on me, and I was incarcerated

15  until I got to trial.  That's why I lost that

16  place.

17    Q.   So on July 6th you were arrested and you

18  lost the residence on 20th Street?

19    A.   Yes.  It was actually July 5th when I got

20  arrested.

21    Q.   Okay.  And then you were held over the

22  night until the 6th?

23    A.   Yes.

24    Q.   Okay.  Who did you live at the 20th Street

**DURANT T. TISDALE**

| 1 | address with? |
| 2 | A. I stayed alone. |
| 3 | Q. And do you have -- are you married? |
| 4 | A. No. |
| 5 | Q. Do you have any kids? |
| 6 | A. Yes. |
| 7 | Q. How many? |
| 8 | A. Five. |
| 9 | Q. Are you currently employed? |
| 10 | A. I'm with an agency. I work occasionally |
| 11 | here and there. |
| 12 | Q. Like a temp agency? |
| 13 | A. Yes. |
| 14 | Q. How often would you say you work |
| 15 | currently? |
| 16 | A. It varies. I might work three days one |
| 17 | week, one day the next week. I might not see no |
| 18 | more work for another week or two. It varies. |
| 19 | Whenever something is available. |
| 20 | Q. Do you have any other source of income |
| 21 | other than your employment? |
| 22 | A. My son helps me out. |
| 23 | Q. Okay. On the night of July 5th, 2013, |
| 24 | what did you do that night? |

DURANT T. TISDALE

1        A.    What did I do that night?

2        Q.    Yes.   Like, before you had any interaction

3   with the police before you were arrested, what did

4   you do kind of during that day or that night?

5        A.    After I got -- I worked that day.   When I

6   got off work, I stopped by my cousin's house.   He's

7   like in his 70s.   He's in his 70s now.   He was in

8   his 70s then, but I generally stop by to check on

9   him.   I stopped by there.

10            When I left there, I was walking.   I

11  walked up to 11th Street.   I was going to catch the

12  23 bus to Lehigh Avenue and then catch the 54 on

13  Lehigh.   I walked up 11th Street.   I got up to

14  around 11th and Dauphin -- between Dauphin and

15  York.   I was going to the bus stop.

16            A woman pulled up.   The police

17  officer pulled up second behind her.   She got out

18  of the car and she pointed in my direction and

19  said, "That's him."   I looked around, you know, to

20  see what she was pointing at because I'm the only

21  one standing there.   She said, "That's him.   He's

22  the one that stole my gate."   The officers come

23  over and was telling me that the woman accused me

24  of taking some property of hers and they asked me

### DURANT T. TISDALE

1  did I have the gate.  I said, "I don't have no

2  gate."  They looked around and didn't find no gate.

3          Another officer went back to the

4  car.  The other officer came back and asked me you

5  people use House of Iron scrap metal and stuff to

6  make odds and ends.  I said, "I just got off work.

7  I don't have no gate.  I didn't take anything."

8          They kept -- I took it as harassment

9  or an assault because he -- they kept saying that I

10  have the gate.  Where is the gate at?  What did you

11  do with the gate?  What did you do with the gate?

12  I said that I don't have no gate.

13          I started getting upset.  I said

14  that I threw the damn gate on the roof like that

15  because I never had no gate.  No gate.  No tools.

16  I don't have an automobile.  There was no way for

17  me to -- in the area that I was located at there's

18  nothing -- there's nowhere to hide anything.  At

19  that point they arrested me.

20      Q.   Okay.  Let's back up to your -- you worked

21  that day, right?

22      A.   Yes.

23      Q.   Where did you work?

24      A.   At Citizens Bank Ballpark.

A 26

DURANT T. TISDALE

1      Q.    What did you do at Citizens Bank Ballpark?
2   What was your job?
3      A.    Housekeeping.  I generally do pressure
4   washing, but during -- throughout the day if
5   there's anything else that's needed to be done and
6   I'm there, they would ask us to help out with
7   whatever else needed to be done.
8      Q.    Just odd jobs around the stadium?
9      A.    Yes.  Cleaning.  They call it
10  housekeeping.
11     Q.    Okay.  Was there a game that night?
12     A.    Yes.  It was the early game.  Early game
13  that day.
14     Q.    So what time would you have gotten off of
15  work?
16     A.    Around about 9:00, 9:30.  Something like
17  that.
18     Q.    And then you went and you visited your
19  cousin?
20     A.    Yes.
21     Q.    What is your cousin's name?
22     A.    George Kenneth.
23     Q.    Where does George Kenneth live -- or where
24  did he live at the time?

**DURANT T. TISDALE**

1     A.   He still resides there.  2005 North

2  Marshall Street.

3     Q.   What part of the city is that?

4     A.   North Philadelphia.

5     Q.   Do you take the Broad Street line up

6  there?

7     A.   Yes.  I took the Broad Street line to

8  Cecil B. Moore Avenue.  Then I caught the three bus

9  going east.  I got off at 6th and Berks and walked

10  up 6th Street and went over to Morris.  Marshall is

11  between 7th and 6th.  The twenty hundred is between

12  Morris and Diamond.

13     Q.   You went and you visited with your cousin

14  when you got there, right?

15     A.   Yes.

16     Q.   How long did you stay there?

17     A.   About 20, 30 minutes maybe.

18     Q.   Does that put us -- I'm kind of trying to

19  piece together the timeline here.

20           You got off work around 9:00.  It

21  probably took about 45 minutes to get to your

22  cousin's house; is that fair?

23     A.   Yes.

24     Q.   That would put you close to 10:00.  You

**DURANT T. TISDALE**

1  spent 20 or 30 minutes there and left some time

2  after 10:00?

3      A.   Yes.

4      Q.   And from there you were going to walk to

5  11th Street?

6      A.   Yes.

7      Q.   To catch a bus, right?

8      A.   Yes.

9      Q.   And before you got to that bus, you were

10  stopped by a police car?

11     A.   Yes.

12     Q.   You observed a woman in the police car?

13     A.   No.

14     Q.   No?

15     A.   She pulled up.  She was parked across the

16  street.

17     Q.   She was driving?

18     A.   Yes.  Before the police even arrived, she

19  pulled up in an automobile and parked across the

20  street.  About 30 seconds later the police pulled

21  up in their automobile and she jumped out and said

22  "That's him."

23     Q.   Did she say anything to you before the

24  police arrived?

**DURANT T. TISDALE**

1      A.   No.

2      Q.   But you just noticed her?

3      A.   Yes.

4      Q.   Were you waiting for the bus there or were

5   you walking?

6      A.   I was waiting for the bus.

7      Q.   Okay.  So you're at a bus stop?

8      A.   Yes.

9      Q.   So she didn't say anything to you?  She

10   pulled up and then you saw a police car pull up --

11      A.   Yes.

12      Q.   -- afterwards and you saw officers speak

13   with the woman?

14      A.   When the officers pulled up, she jumped

15   out of the car and she was like sort of flagging

16   them and said "That's him."  That's when I looked

17   around like who is she talking about.

18      Q.   She pointed at you?

19      A.   Yes.  She was pointing in my direction,

20   but I'm thinking somebody else is around because I

21   know I didn't do anything.

22      Q.   And after she identified you, the police

23   officers talked to you, right?

24      A.   Yes.

**DURANT T. TISDALE**

1  Q. I think you described the police officers

2 asked you where the grate was?

3  A. Yes.

4  Q. You said you didn't know?

5  A. I didn't even know what they were talking

6 about.

7  Q. Right.  At some point you said, "I threw

8 the grate on the roof"?

9  A. Yeah, because they were like -- after

10 asking me several times and looking around the

11 vicinity and didn't find nothing, it's as if --

12 they was asking me as if I was lying to them.  Like

13 I told the officer, I said, "Listen, I don't want

14 no trouble.  I just got off work.  I'm on parole.

15 I'm not trying to go back to jail.  I didn't have

16 any grate.  I don't know what you're talking

17 about."

18  Q. Okay.  But then after being questioned at

19 some point you said "I threw the grate on the

20 roof"?

21  A. It went from like a question, from being

22 questioned, to like telling me where is the grate

23 at.  We know you got the grate.  What did you do

24 with it?  It went from asking questions to like,

**DURANT T. TISDALE**

1  you know, insisting that I had it.  It got me

2  upset.

3  Q.  And I guess you were upset, and that's

4  when you said you threw the grate on the roof?

5  A.  After they looked around underneath the

6  cars, alleyways, anyplace they could look to search

7  and see and found nothing, they continued to ask me

8  what did I do with the grate.  The woman was

9  telling the officers, "He just had it.  When you

10  all pulled up, he just had it.  What he done with

11  it, I don't know."  I don't even know what she's

12  talking about.

13  Q.  You didn't have a grate when the female

14  pulled up?

15  A.  I don't know if it was a grate or gate or

16  fence or what.  I don't know what it was.

17  Q.  Okay.  Do you know a person named Brenda

18  Lee?

19  A.  No.

20  Q.  Okay.  Did you know the woman that was

21  accusing you of stealing the grate?

22  A.  No.

23  Q.  You didn't recognize her from anywhere?

24  A.  No.

**DURANT T. TISDALE**

1    Q.   Okay.  Back to your employment at Citizens
2    Bank Park, what was your uniform that you wore when
3    you were working?
4    A.   Phillies ball cap, grayish-colored T-shirt
5    -- polo shirt with a Phillies emblem right here
6    (indicating).
7    Q.   There is an arrest photo sitting in front
8    of you.
9         Do you recognize that photograph?
10   A.   That's me on there.
11   Q.   Is that you on the morning after you were
12   arrested?
13   A.   This is the following day.
14   Q.   Right.
15   A.   The next day.
16   Q.   Right.  The following morning.  The time
17   on it is --
18   A.   8:21 a.m.
19   Q.   Right.  So that was the morning after you
20   were arrested, right?
21   A.   Um-hmm.
22   Q.   You've got to say yes or no.
23   A.   Yes.
24   Q.   Just for the record, you have to say yes

**DURANT T. TISDALE**

1  or no.  I understood you, but it won't be clear on
2  the record.
3           That shirt that you are wearing, was
4  that part of your uniform?
5      A.   No.
6      Q.   Okay.  Is that a different shirt than you
7  were wearing when you were arrested?
8      A.   Yes.
9      Q.   What kind of shirt were you wearing when
10 you got arrested?
11     A.   My uniform shirt.
12     Q.   What is that shirt?
13     A.   That's a black T-shirt.
14     Q.   Where did you get that black T-shirt?
15     A.   I had a bookbag with me with a T-shirt and
16 another pair of pants in there.
17     Q.   So you changed your outfit?
18     A.   I changed my shirt because I was sleeping
19 on the floor in the holding tank at the police
20 department.
21     Q.   Did they let you bring your bag in to
22 change?
23     A.   Yeah.  They didn't take anything from me. ✳
24     Q.   Okay. ' Were you wearing a hat when you

DURANT T. TISDALE

```
 1    were arrested?
 2        A.   Yes.
 3        Q.   What color was the hat?
 4        A.   It was a blue -- it's a baseball cap.
 5    It's blue with red in the front with the Phillies
 6    emblem on it.
 7        Q.   Okay.  Moving to after your arrest, you
 8    said you spent the night in the holding tank?
 9        A.   Yes.
10        Q.   Then you were processed it looks like --
11        A.   Yes.
12        Q.   -- based on the time of your arrest photo;
13    is that fair?
14        A.   Yes.
15        Q.   What happened next?
16        A.   While I was there?
17        Q.   After you were processed, what happened?
18        A.   After I was processed, I seen a gentleman
19    on closed-circuit TV.  They gave me bail and 30
20    minutes later they were sending me to jail.
21        Q.   What jail did they take you to?
22        A.   First they took me to the House of
23    Corrections.  About two weeks later -- about two
24    weeks later they took me to Graterford.
```

**DURANT T. TISDALE**

1    Q.    How much time did you serve in jail after
2    this arrest?
3    A.    I was there until like December the 5th or
4    December the 6th.
5    Q.    So about five months?
6    A.    About five or six months.
7    Q.    That was split between the House of
8    Corrections and Graterford?
9    A.    Well, at the House of Corrections I was
10   there only about two weeks.  The rest of the time I
11   was at Graterford.
12   Q.    Any issues while you were in prison?
13   A.    Stressed out.  Depressed.
14   Q.    Anything else?
15   A.    I can think of many things.  It bothered
16   me.  Couldn't sleep.  Nervous.  Scared I was going
17   back to jail.  A million things.  I can't think of
18   all of them right now.
19   Q.    Do you have any idea why this woman Brenda
20   Lee -- I'll represent to you that the witness in
21   the case, at least according to the police
22   paperwork, was named Brenda Lee.
23          Do you have any idea why she accused
24   you of stealing the grate?

**DURANT T. TISDALE**

| | | |
|---|---|---|
| 1 | A. | I don't know.  I don't have an idea. |
| 2 | Q. | Okay.  Now, you mentioned that you were on |
| 3 | parole or probation? | |
| 4 | A. | Parole. |
| 5 | Q. | Parole.  I didn't ask you yet about your |
| 6 | criminal history. | |
| 7 | | What were you on parole for? |
| 8 | A. | Robbery. |
| 9 | Q. | How much time did you serve for the |
| 10 | robbery conviction? | |
| 11 | A. | About eight years. |
| 12 | Q. | And you had been paroled in what year? |
| 13 | A. | 2009. |
| 14 | Q. | So you had been out of jail for about four |
| 15 | years? | |
| 16 | A. | Yes. |
| 17 | Q. | And how long did your parole or probation |
| 18 | last? | |
| 19 | A. | I'm still on parole. |
| 20 | Q. | How long does it last? |
| 21 | A. | Until September 2017. |
| 22 | Q. | So about eight years from your release |
| 23 | date? | |
| 24 | A. | Um-hmm.  Yes. |

DURANT T. TISDALE

| | |
|---|---|
| 1 | Q.   Other than the robbery conviction, do you |
| 2 | have any other convictions, criminal convictions? |
| 3 | A.   Before that. |
| 4 | Q.   To the best of your recollection.  I know |
| 5 | you don't have your criminal -- any kind of |
| 6 | paperwork in front of you to tell you the dates, |
| 7 | but as far as you can recall? |
| 8 | A.   I have two drug cases. |
| 9 | Q.   Were you convicted? |
| 10 | A.   Yes.  It was like probation, but it's |
| 11 | still a conviction. |
| 12 | Q.   You received probation? |
| 13 | A.   Um-hmm.  Yes. |
| 14 | Q.   When was that? |
| 15 | A.   A can't remember exactly. |
| 16 | Q.   Was it prior to the -- |
| 17 | A.   It was before the robbery.  Years before |
| 18 | the robbery. |
| 19 | Q.   Anything else in your criminal history? |
| 20 | A.   Not that I can remember.  There's a few |
| 21 | things.  I can't exactly remember what they were |
| 22 | all about. |
| 23 | Q.   Any other felonies besides the robbery? |
| 24 | A.   No. |

**DURANT T. TISDALE**

```
 1        Q.    So if I understand kind of the status of
 2   your criminal kind of situation at the time of this
 3   arrest, you were on parole from the robbery
 4   conviction and that parole was set to last and
 5   still is set to last until 2017?
 6        A.    Correct.
 7        Q.    And did that affect your ability to make
 8   bail or --
 9        A.    Yes.
10        Q.    So how does that work?
11        A.    When you're on state parole and you've
12   been charged -- have police contact and as they say
13   "catch a case," you have a bail set.  They won't
14   let you pay the bail.  The state will come pick you
15   up and take you upstate and detain you until the
16   outcome of your open case.
17        Q.    Do you know whether bail was set in this
18   case?
19        A.    Yes.
20        Q.    What was bail set at?
21        A.    $2,000.
22        Q.    Did you ever pay the bail?
23        A.    I would have to pay 10 percent of that,
24   but they wouldn't let me pay because I'm on state
```

**DURANT T. TISDALE**

1    parole.  If I pay the bail, they're still not going

2    to let me go.

3        Q.    My question is just whether you ever tried

4    to pay it.

5                    Did you ever pay the $200?

6        A.    They wouldn't let me pay it.  It's

7    something that the state does with the county and

8    they call it a payoff and they take you upstate.

9        Q.    Well, I think I understand that you

10   wouldn't have been released from custody if you had

11   paid the bail, but I'm wondering whether you ever

12   attempted to pay it and they said you can't pay

13   this?

14       A.    That's what happened.

15       Q.    That's what happened?

16       A.    Right.

17       Q.    Okay.  When was that?  When did you try to

18   pay the bail?

19       A.    My significant other was going to pay it,

20   and they told -- I don't remember what date.  It

21   was in July, though, but they told her they're not

22   going to accept the money -- this is what they told

23   her.  We're not going to accept the money because

24   he's not going to be released.  That's what they

1    told her.

2        Q.   I understand that you were in jail until

3    December, right?

4        A.   Yes.

5        Q.   Of 2013?

6        A.   Yes.

7        Q.   Now, what caused you to be released from

8    jail?

9        A.   All I know is that the charges was

10   dismissed or I was -- I don't know.  They never

11   even took me down.  All I know was they told me the

12   charge was dismissed or the District Attorney

13   withdrew it or something.  I don't exactly know.

14       Q.   As far as visits to court while you were

15   incarcerated for this arrest, did you -- other than

16   the arraignment that you testified about where you

17   went to CCTV -- that was an arraignment, right?

18       A.   That was a bail hearing really, actually.

19       Q.   Okay.  That was your bail hearing.  Then

20   you were taken to HOC.

21            Did you ever go back to court?

22       A.   No.

23       Q.   So you just remained at either HOC or

24   Graterford for the remainder of the time?

**DURANT T. TISDALE**

1       A.    Yes.

2       Q.    Were you at Graterford because you had

3  previously been a state prisoner or you were on

4  state parole?  Is that why you were at Graterford?

5       A.    Well, it's like until my bail was paid,

6  right, I stayed in the county but the state and the

7  county have this thing that is called a payoff.

8  That's all I know, is it's called a payoff, and I

9  think the state paid my bail.  That's why I went

10  upstate.  I don't know how they do that or how they

11  work that out.

12      Q.    So you don't really know why you ended up

13  at Graterford?

14      A.    I know why because I'm state property.

15      Q.    Right.  Because you were on a detainer

16  from a state court conviction, the state sentence?

17      A.    Right.

18      Q.    You said that the outfit that you were

19  wearing when you were arrested was a gray Phillies

20  polo shirt?

21      A.    Yes.  I had on blue jeans.  I'm trying to

22  think.  Was it blue jeans or black Dickies?   I

23  think it was blue jeans and a gray polo shirt with

24  the Phillies emblem and a ball cap.  I also had my

**DURANT T. TISDALE**

1    --

2        Q.    Badge?

3        A.    Yes.  I had it around my neck.  The ID tag

4    that you swipe (indicating).

5        Q.    You were motioning for something around

6    your neck like a lanyard I think they're called?

7        A.    It's a tag with your -- like your

8    identification, but it's on a --

9        Q.    A string thing?

10       A.    Yes.

11       Q.    I understand what you're saying.  I'm just

12   trying to make it clear for the record.

13             If you recall the tone of your gray

14   shirt, was it like a charcoal gray or a lighter

15   gray?

16       A.    It wasn't no light gray.

17       Q.    It was like a dark gray?

18       A.    Yes.  It was like a darker gray.

19       Q.    Prior to seeing the female witness that

20   accused you of stealing the grate kind of pull up

21   alongside of you, did you see her before that day

22   at any point?

23       A.    That's the first time I ever seen her.

24       Q.    Do you know where 2220 North Delhi Street

DURANT T. TISDALE

1    is?

2        A.    I know where Delhi Street is.

3        Q.    Okay.  I guess it would be the 2200 block

4    of Delhi Street closer to 23rd?

5        A.    I'm from that neighborhood because I grew

6    up on 8th and Diamond, 2100 block of Diamond

7    Street.

8        Q.    Do you know whether you passed by or spent

9    any time in front of 2220 North Delhi Street on

10   your walk from your cousin's house to 11th Street?

11       A.    I remember exactly which way I went.  I

12   came up Marshall Street.  I came up Marshall Street

13   to Diamond.  I went west on Diamond to 9th Street.

14   I went north up 9th Street to Susquehanna and I

15   went west on Susquehanna to 11th.  Then I went

16   north up 11th.

17       Q.    Okay.

18       A.    I never walked by Delhi Street.  It's in

19   that vicinity, but the route that I took wouldn't

20   even took me past that block.

21       Q.    How close to that block did you get, if

22   you recall?

23       A.    As a matter of fact, I did walk by there.

24   I walked -- Delhi Street runs north and south.

1  Susquehanna runs east and west.  This is 9th
2  street.  This is Susquehanna (indicating).  I
3  walked straight down Susquehanna.  I never went on
4  Delhi Street.
5      Q.   Okay.  But you would have walked kind of
6  by that block while you were on Susquehanna?
7      A.   Yeah.  I've got to cross that block to get
8  from -- there is a street -- it's between 9th
9  Street and 10th Street.  So I would have to cross
10  that block.
11      Q.   Okay.
12      A.   But I never ventured on that block.
13      Q.   Now, as far as your employment with the
14  Phillies, how often did you work for the Phillies
15  around the time of your arrest in July of 2013?
16      A.   I was working steady full time.
17      Q.   Full-time employee?
18      A.   Yeah.
19      Q.   How many hours a week?
20      A.   Forty.  Sometimes more.
21      Q.   And how much did you earn a week?
22      A.   About 9.50 -- a week?
23      Q.   Or however you want to do it.
24      A.   About 9.50.

**DURANT T. TISDALE**

1     Q.   $9.50 an hour?

2     A.   Yes.  About 9.50 or 9.55.  Something like

3 that.  I'm not sure.

4     Q.   Do you recall what your take-home pay was

5 for a two-week check or a month check?

6     A.   It would vary because, like, working with

7 the Phillies I would have my regular 40 hour week,

8 but during game days the hours would stretch out.

9 Sometimes I would have a lot of overtime.

10    Q.   So it varied?

11    A.   Yeah.

12    Q.   Did you ever work less than 40 hours a

13 week?

14    A.   No, not that I can recall.

15    Q.   Did you file taxes in 2013 or for the tax

16 year 2013?

17    A.   Yes.

18    Q.   What about for 2014?

19    A.   No.  I lost my job when I got arrested

20 because I had no call, no show.  I sat in jail for

21 about six months.

22    Q.   After you were released in December of

23 2013, were you able to find another job?

24    A.   No.

**DURANT T. TISDALE**

```
 1        Q.   Okay.  What was the first job you started
 2   working at after your release from jail?
 3        A.   I was doing odds and ends.  Odd jobs.
 4   First -- the first job as far as getting a paycheck
 5   was -- I started July of this year.
 6        Q.   What job was that?  It probably would have
 7   been July of last year?
 8        A.   Yes.  July of 2015 when I started working
 9   with -- down at Trinity Staffing.
10        Q.   Is that the position you're currently in?
11        A.   Yes.
12             MR. SHOTLAND:  Could we go off the
13        record for a second?
14             (There was a discussion held off the
15        record.)
16   BY MR. SHOTLAND:
17        Q.   Mr. Tisdale, I think we have now talked
18   about your arrest, your roughly five months
19   incarceration and the issues related to your
20   incarceration, as well as the period of time you
21   missed from work as a result of the arrest,
22   correct?
23        A.   Yes.
24        Q.   Is there anything else that -- any other
```

**DURANT T. TISDALE**

1  kind of damages that you attribute to your arrest

2  from July of 2013 other than what we have already

3  talked about?

4      A.    Well, when I was released, I was released

5  on parole with no job and nowhere to go.  I had to

6  go stay at my aunt's and sleep on her couch.

7              My stress level went up so bad I had

8  a heart attack like a couple of weeks after getting

9  out of jail because I was like really going through

10 things mentally in my head, you know.  The first

11 time in my life I'm doing something right and then,

12 you know, this happened to me.  It takes me all the

13 way back to now I lost everything.  I'm on

14 somebody's couch.  I'm on parole.  At any given

15 time they can come pick me up and take me to jail

16 because I'm not stable as far as financially or

17 stable housing and things of this nature.

18              I really think that played a part in

19 it because had I not got arrested for something I

20 didn't even do, none of that wouldn't have

21 happened.

22     Q.    How long were you hospitalized -- or were

23 you hospitalized for the heart attack?

24     A.    Yes.  About two or three weeks.  Something

1    like that, maybe.

2         Q.    Where did you go?

3         A.    Temple.

4         Q.    Temple Hospital?

5         A.    Yes.

6         Q.    How is your health now?

7         A.    Well, it's fair, but I still have to take

8    thinners and some other kind of pills.  They say

9    I'll be taking that for the rest of my life.

10        Q.    Is that a pill for high blood pressure?

11        A.    No.  It's for my heart.  They had to put

12   stents in my heart.

13        Q.    You had heart surgery?

14        A.    Not open heart surgery, but they put

15   something in there.

16        Q.    You take medication for whatever they put

17   in there?

18        A.    For my heart, um-hmm.

19        Q.    Yes?

20        A.    Yes.

21        Q.    Anything else as a result of the arrest?

22        A.    No.  I'm still struggling.  I know that.

23        Q.    Now, the defendants in this case are

24   Timothy Gibson and David Sherwood.

1           Do you recognize -- they're both
2   police officers -- or one was a police officer and
3   one was a detective.
4           Do you know who those people are?
5       A.   Excuse me.  Could you rephrase that?  One
6   was what?
7       Q.   One was a detective.  David Sherwood is
8   actually a detective.  He's sued as a police
9   officer, but we have learned that he's actually a
10  detective with the police department.
11      A.   When I was arrested, I was arrested by two
12  uniformed police officers.
13      Q.   Okay.  Do you know their names?
14      A.   No.
15      Q.   Does the name Timothy Gibson ring a bell,
16  Police Officer Gibson?
17      A.   The only names I know is what is on the
18  report, but I know I was arrested by two uniformed
19  police officers because the day of the arrest I
20  requested a white shirt or to speak to a detective.
21  They refused to let me do that.
22      Q.   What about a Police Officer Whitaker?  Was
23  that a familiar name?
24      A.   No.

**DURANT T. TISDALE**

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | A. | I know there was two. They were young |
| 3 | Caucasians and they were uniformed police officers. |
| 4 | Q. | Two male -- white male officers? |
| 5 | A. | Yes. |
| 6 | Q. | They were younger? |
| 7 | A. | Yes. |
| 8 | Q. | About how old? |
| 9 | A. | It looked like they was in their twenties |
| 10 | to me. |

11              MR. SHOTLAND:  Those are all the

12           questions I have for you.  Thank you.

13              MR. McDERMOTT:  I just have a few

14           questions.

15    BY MR. McDERMOTT:

16       Q.   Mr. Tisdale, the night that you were

17    arrested you were standing at a bus stop, correct?

18       A.   Yes.

19       Q.   What bus were you waiting for?

20       A.   The 23.

21       Q.   Prior to that time, you were at your

22    cousin's house?

23       A.   Yes.

24       Q.   Did you actually see your cousin?

**DURANT T. TISDALE**

1        A.    Yes.

2        Q.    What is his name?

3        A.    George Kenneth.

4        Q.    You left Mr. Kenneth's home and you

5   actually crossed Delhi Street, correct, as you were

6   walking to the bus?

7        A.    Yes.

8        Q.    Did you take any grate at any time from

9   any property on Delhi Street?

10       A.    No.

11       Q.    Did you have in your possession at any

12   time a shopping cart?

13       A.    No.

14       Q.    Did you have in your possession at any

15   time a grate?

16       A.    No.

17       Q.    When the lady -- the woman stopped her

18   car, what attracted your attention to her car?

19       A.    She pulled up and -- I'm from North

20   Philly.  If an automobile pulls up, to be safe, I

21   looked.

22       Q.    So just her pulling up attracted your

23   attention?

24       A.    Yes.

**DURANT T. TISDALE**

1    Q.    How long after that did the police come?

2    A.    About 25 to 30 seconds later.

3    Q.    Did they pull right behind her?

4    A.    They pulled like right beside her.

5    Q.    Okay.  When they approached you, what did

6    you tell them?

7    A.    I asked them -- the first thing I asked

8    them was what's going on.

9    Q.    What did they tell you?

10   A.    They said that a woman said you took some

11   property of hers.

12   Q.    Any further conversation after that?

13   A.    Yes.  I said, "Well, what property?"  The

14   officer hollered that it's a gate or a fence or

15   something like that, of that nature.

16   Q.    Did they search the area for the property

17   they believed the lady was talking about?

18   A.    Yes.

19   Q.    Where did they search?

20   A.    Under the cars.  There is a small alleyway

21   there, I think.  Around the other side of the

22   building.

23   Q.    Did one of the officers stay with you

24   while the other searched or did they both search?

**DURANT T. TISDALE**

1    A.    One stayed with me while the other

2    searched.

3    Q.    Did he say anything to you at the time?

4    A.    He kept asking me where the gate is at.

5    Q.    Now, the officer that stayed with you, was

6    he white or black?

7    A.    He was white.

8    Q.    And his partner, what was his skin color?

9    A.    He was white.

10    Q.    So it was two white police officers.

11          Can you tell us whether one was

12    taller, shorter, heavy, skinny?  Any

13    differentiations between them?

14    A.    It's been a long time, but if I'm not

15    mistaken, they were pretty much about the same

16    height, built similar.  I know one of them had dark

17    hair.

18    Q.    How long was the one that left away from

19    you and the other officer?

20    A.    He just searched everything nearby within

21    like maybe 15, 20 feet range all the way around.

22    Q.    Okay.  What kind of neighborhood is this?

23    Is this residential, is this business, is it

24    commercial?  What is it?

**DURANT T. TISDALE**

1    A.    It's like a residential neighborhood, but

2  also it's small -- where I was located there is a

3  garage on the corner that do body fender work, I

4  guess, for automobiles.    That's where I was

5  standing at, but next to the garage is residential

6  housing where people live at.

7    Q.    You testified earlier that you asked the

8  officers if you could see a white shirt.

9              What did you mean by a white shirt?

10    A.    Like a lieutenant or captain or somebody.

11    Q.    Did they comply with that?

12    A.    No.    They told me ain't none here or

13  something.    It was a real sarcastic remark.    Then I

14  asked to speak to a detective.    I never spoke to

15  one of them.    They wouldn't let me see one of them

16  either.

17    Q.    When you asked to speak to a detective,

18  did you ask to speak to a detective when you were

19  out on the street?

20    A.    On the street.

21    Q.    Both requests were refused, whether it was

22  for a white shirt or lieutenant or a captain or a

23  detective, right?

24    A.    Yes.

**DURANT T. TISDALE**

1      Q.    Did the officers ever take you back to

2    this house where the grate was allegedly stolen

3    from to take a look at the grate?

4      A.    No.

5      Q.    So they took you from the corner where

6    they stopped you to where?

7      A.    The district.

8      Q.    Okay.  Did they take anything off of you,

9    such as tools or anything?

10     A.    No.

11     Q.    Did you have any tools on you?

12     A.    No.

13     Q.    Who was your supervisor for the Phillies

14   organization?  When you went to work, who did you

15   report to?

16     A.    I can't think of his last name.  His name

17   was Sam.

18     Q.    How long had you been working there?

19     A.    Since March of 2010.

20     Q.    The case itself after you were arrested,

21   were you brought to court each time it was listed?

22     A.    No.

23     Q.    Did you ever go to court for the case?

24     A.    No.

DURANT T. TISDALE

1    Q.    How did you find out that the case was

2    dismissed?

3    A.    I received a letter, legal mail, from the

4    court informing me that it was dismissed.

5    Q.    In reference to when you were talking to

6    the police officers and they were asking you about

7    the grate, did any of them ask you about a shopping

8    cart?

9    A.    One of them did.

10    Q.    And did you have a shopping cart with you?

11    A.    No.

12    Q.    Did they look for a shopping cart?

13    A.    Yes.

14    Q.    And were they able to find the shopping

15    cart?

16    A.    No.

17    Q.    Were you the only person on the corner at

18    the time?

19    A.    Yes.

20    Q.    How long were you on the corner prior to

21    noticing that this car pulled up and stopped across

22    the street?

23    A.    I might have been there about five or

24    maybe ten minutes tops.

**DURANT T. TISDALE**

1    Q.    When the police came, you told them you

2    were on parole?

3    A.    Yes.

4    Q.    Did the lady say anything when you were

5    arrested?

6    A.    She said something -- I can't recall

7    everything word for word, but I know she did make a

8    comment of you're going to jail for stealing.

9    Q.    She made that comment to you?

10   A.    Yes.  I remember the officers told her to

11   follow us to the district to fill out the

12   paperwork.

13   Q.    Did you notice the car following you?

14   A.    Yes.

15   Q.    By the way, counsel was asking you a

16   little bit earlier if you knew the police officers.

17            You said you didn't know the police

18   officers, correct?

19   A.    Right.  Not by name.

20   Q.    Well, did you recognize the police

21   officers?

22   A.    I know they was young.  They was --

23   Q.    Well, by "recognize," I mean did you ever

24   see them before?  Did you have --

DURANT T. TISDALE

```
1         A.    No.
2         Q.    So you didn't have any quarrels with these
3    two police officers?
4         A.    No.
5         Q.    They never arrested you before?
6         A.    No.
7         Q.    When you were taken in, did you ever ask
8    to see a detective again?
9         A.    Yes.
10        Q.    And were you given the opportunity to see
11   a detective?
12        A.    No.
13        Q.    So no statement was ever taken from you?
14        A.    No.
15        Q.    Now, the reason why your girlfriend --
16   what is her name, by the way?
17        A.    Annette Grover.
18        Q.    -- couldn't pay bail for you is because
19   you had a detainer from the state lodged against
20   you, correct?
21        A.    Yes.
22        Q.    That is because you were on parole for
23   robbery at the time?
24        A.    Yes.
```

**DURANT T. TISDALE**

1    Q.    And you told the police officers that?

2    A.    Yes.

3    Q.    So no bail was actually paid on your

4    behalf?

5    A.    Correct.

6         MR. McDERMOTT:  I have no other

7         questions.

8         MR. SHOTLAND:  Nothing further.

9         Thanks for your time.

10             (Deposition concluded at 2:41 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**DURANT T. TISDALE**

1

2                                CERTIFICATION

3

4                                   - - -

5

6         I hereby certify that the testimony and

7    the proceedings in the aforegoing matter are

8    contained fully and accurately in the

9    stenographic notes taken by me, and that the

10   copy is a true and correct transcript of the

11   same.

12

13            *Donna M. Ray, RPR. CCR*

14   _____

     DONNA M. RAY, R.P.R., C.C.R.

15        License No. XI 02161

16

17

18         The foregoing certification does not apply to

19   any reproduction of the same by any means unless

20   under the direct control and/or supervision of the

21   certifying shorthand reporter.

22                                   - - -

23

24

A-61

## LAWYER'S NOTES

| Page | Line | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**DURANT T. TISDALE**

**A**

a.m 18:18
Aaron 2:8 4:15
ability 6:21 24:7
able 31:23 42:14
accept 25:22,23
accurately 6:13,21
  46:8
accused 10:23
  21:23 28:20
accusing 17:21
ACTION 1:5
address 9:1
affect 6:20 24:7
aforegoing 46:7
afternoon 4:14
agency 9:10,12
ain't 40:12
al 1:8
allegedly 41:2
Allegheny 7:17,18
  7:24
alleyway 38:20
alleyways 17:6
alongside 28:21
and/or 46:20
Annette 44:17
answer 4:23 5:11
  5:15,16,23 6:6
answers 5:21
anyplace 17:6
APPEARANCES
  2:1
apply 46:18
approached 38:5
Arch 1:13 2:9
area 11:17 38:16
arraignment 26:16
  26:17
arrest 18:7 20:7,12
  21:2 24:3 26:15
  30:15 32:18,21
  33:1 34:21 35:19
arrested 8:12,13,17
  8:20 10:3 11:19
  18:12,20 19:7,10
  20:1 27:19 31:19
  33:19 35:11,11,18
  36:17 41:20 43:5
  44:5
arrived 14:18,24
asked 10:24 11:4
  16:2 38:7,7 40:7
  40:14,17
asking 4:23 5:10,16
  16:10,12,24 39:4
  42:6 43:15

**B**

assault 11:9
assume 6:7
attack 33:8,23
attempted 25:12
attention 37:18,23
Attorney 26:12
attracted 37:18,22
attribute 33:1
aunt's 33:6
automobile 11:16
  14:19,21 37:20
automobiles 40:4
available 9:19
Avenue 7:17 10:12
  13:8

**B**

B 3:11 13:8
back 8:5 11:3,4,20
  16:15 18:1 21:17
  26:21 33:13 41:1
bad 33:7
Badge 28:2
bag 19:21
bail 20:19 24:8,13
  24:14,17,20,22
  25:1,11,18 26:18
  26:19 27:5,9
  44:18 45:3
ball 18:4 27:24
Ballpark 11:24 12:1
Bank 11:24 12:1
  18:2
baseball 20:4
based 20:12
beginning 1:15
behalf 45:4
believed 38:17
bell 35:15
Berks 13:9
best 23:4
birth 7:11
bit 5:6 43:16
black 19:13,14
  27:22 39:6
block 29:3,6,20,21
  30:6,7,10,12
blood 6:18,18 34:10
blue 20:4,5 27:21
  27:22,23
body 6:1 40:3
bookbag 19:15
bothered 21:15
Brenda 17:17 21:19
  21:22
bring 19:21
Broad 13:5,7

**C**

brought 41:21
building 1:13 2:8
  38:22
built 39:16
bus 10:12,15 13:8
  14:7,9 15:4,6,7
  36:17,19 37:6
business 39:23

**C**

C.C.R 46:14
call 12:9 25:8 31:20
called 4:18 27:7,8
  28:6
cap 18:4 20:4 27:24
captain 40:10,22
car 10:18 11:4
  14:10,12 15:10,15
  37:18,18 42:21
  43:13
cars 17:6 38:20
cart 37:12 42:8,10
  42:12,15
case 4:16 21:21
  24:13,16,18 34:23
  41:20,23 42:1
cases 23:8
catch 10:11,12 14:7
  24:13
Caucasians 36:3
caught 13:8
caused 26:7
CCTV 26:17
Cecil 13:8
certification 4:3
  46:2,18
Certified 1:17,21
certify 46:6
certifying 46:21
change 19:22
changed 19:17,18
charcoal 28:14
charge 26:12
charged 24:12
charges 26:9
check 10:8 31:5,5
Citizens 11:24 12:1
  18:1
city 1:7,12 2:7 4:17
  13:3
CIVIL 1:3,5
Cleaning 12:9
clear 6:2 19:1 28:12
close 13:24 29:21
closed-circuit
  20:19
closer 29:4

**D**

color 20:3 39:8
come 10:22 24:14
  33:15 38:1
comment 43:8,9
commercial 39:24
comply 40:11
concluded 45:10
contact 24:12
contained 46:8
continued 17:7
control 46:20
conversation 5:14
  38:12
convicted 23:9
conviction 22:10
  23:1,11 24:4
  27:16
convictions 23:2,2
copy 46:10
corner 40:3 41:5
  42:17,20
correct 24:6 32:22
  36:17 37:5 43:18
  44:20 45:5 46:10
Corrections 20:23
  21:8,9
couch 33:6,14
counsel 2:5,11 4:2
  43:15
county 25:7 27:6,7
couple 33:8
court 1:1,17,21,21
  4:24 26:14,21
  27:16 41:21,23
  42:4
cousin 12:19 13:13
  36:24
cousin's 10:6 12:21
  13:22 29:10 36:22
criminal 22:6 23:2,5
  23:19 24:2
cross 30:7,9
crossed 37:5
currently 6:17 7:15
  7:16 9:9,15 32:10
custody 25:10

**D**

D 3:1 8:1
D-U-R-A-N-T 7:5
damages 33:1
damn 11:14
dark 28:17 39:16
darker 28:18
date 7:11 22:23
  25:20
dates 23:6

**D**

Dauphin 10:14,14
David 34:24 35:7
day 8:6 9:17 10:4,5
  11:21 12:4,13
  18:13,15 28:21
  35:19
days 9:16 31:8
December 8:10
  21:3,4 26:3 31:22
defendant 4:15
defendants 1:8
  2:11 4:16 34:23
Delhi 28:24 29:2,4,9
  29:18,24 30:4
  37:5,9
demonstrate 5:24
department 1:8,13
  2:7 19:20 35:10
deposed 4:19
deposition 1:11
  4:19,21 45:10
Depressed 21:13
described 16:1
DESCRIPTION 3:12
detain 24:15
detainer 8:14 27:15
  44:19
detective 35:3,7,8
  35:10,20 40:14,17
  40:18,23 44:8,11
Diamond 13:12
  29:6,6,13,13
Dickies 27:22
different 19:6
differentiations
  39:13
direct 46:20
direction 10:18
  15:19
discussion 32:14
dismissed 26:10,12
  42:2,4
district 1:1,2 26:12
  41:7 43:11
DIVISION 1:3
doing 5:22 32:3
  33:11
DONNA 1:16 46:14
driving 14:17
drug 23:8
duly 4:8
Durant 1:5,11 3:3
  4:7 7:4,4

**E**

E 3:1,11
earlier 40:7 43:16

A-63

early 12:12,12
earn 30:21
east 13:9 30:1
**EASTERN** 1:2
eight 22:11,22
either 6:20 26:23
  40:16
emblem 18:5 20:6
  27:24
employed 9:9
employee 30:17
employment 9:21
  18:1 30:13
ended 27:12
ends 11:6 32:3
**ESQUIRE** 2:3,8
essentially 4:22
et 1:8
exactly 23:15,21
  26:13 29:11
**EXAMINATION** 3:4
  4:11
examined 4:8
**Excuse** 35:5
**EXHIBIT** 3:12
**Exhibits** 3:13
express 6:3

_____ F _____

fact 29:23
fair 13:22 20:13
  34:7
familiar 35:23
far 5:22 23:7 26:14
  30:13 32:4 33:16
feeling 6:23
feet 39:21
felonies 23:23
female 17:13 28:19
fence 17:16 38:14
fender 40:3
file 31:15
filing 4:3
fill 43:11
financially 33:16
find 11:2 16:11
  31:23 42:1,14
fine 5:22 6:24
finished 5:10,16
first 3:12 4:7 20:22
  28:23 32:1,4,4
  33:10 38:7
five 9:8 21:5,6
  32:18 42:23
flagging 15:15
floor 1:14 2:9 19:19
follow 43:11

following 18:13,16
  43:13
follows 4:9
foregoing 46:18
form 4:4
**Forty** 30:20
found 17:7
four 22:14
**Friday** 1:15
front 18:7 20:5 23:6
  29:9
full 30:16
**Full-time** 30:17
fully 46:8
further 38:12 45:8

_____ G _____

game 12:11,12,12
  31:8
garage 40:3,5
gate 10:22 11:1,2,2
  11:7,10,10,11,11
  11:12,14,15,15
  17:15 38:14 39:4
generally 10:8 12:3
gentleman 20:18
**George** 12:22,23
  37:3
getting 11:13 32:4
  33:8
**Gibson** 34:24 35:15
  35:16
girlfriend 44:15
give 5:5,23
given 33:14 44:10
go 5:6 16:15 25:2
  26:21 32:12 33:5
  33:6 34:2 41:23
going 4:22 5:5 6:7
  10:11,15 13:9
  14:4 21:16 25:1
  25:19,22,23,24
  33:9 38:8 43:8
**Good** 4:14 7:1
gotten 12:14
grate 16:2,8,16,19
  16:22,23 17:4,8
  17:13,15,21 21:24
  28:20 37:8,15
  41:2,3 42:7
**Graterford** 20:24
  21:8,11 26:24
  27:2,4,13
gray 27:19,23 28:13
  28:14,15,16,17,18
grayish-colored
  18:4

grew 29:5
**Grover** 44:17
guess 17:3 29:3
  40:4

_____ H _____

H 3:11
hair 39:17
happened 20:15,17
  25:14,15 33:12,21
harassment 11:8
hat 19:24 20:3
head 5:24 33:10
health 34:6
hear 7:1
hearing 26:18,19
heart 33:8,23 34:11
  34:12,13,14,18
heavy 39:12
height 39:16
held 1:12 8:21
  32:14
help 12:6
helps 9:22
hide 11:18
high 6:18 34:10
history 22:6 23:19
HOC 26:20,23
holding 19:19 20:8
hollered 38:14
home 37:4
honestly 6:12,21
**Hospital** 34:4
hospitalized 33:22
  33:23
hour 31:1,7
hours 30:19 31:8
  31:12
house 10:6 11:5
  13:22 20:22 21:7
  21:9 29:10 36:22
  41:2
housekeeping 12:3
  12:10
housing 33:17 40:6
hundred 13:11

_____ I _____

ID 28:3
idea 21:19,23 22:1
identification 28:8
identified 15:22
incarcerated 8:14
  26:15
incarceration 32:19
  32:20
incident 8:4

income 9:20
indicating 18:6
  28:4 30:2
informing 42:4
insisting 17:1
instructions 5:6
interaction 10:2
interview 4:22
**Iron** 11:5
issues 21:12 32:19

_____ J _____

jail 16:15 20:20,21
  21:1,17 22:14
  26:2,8 31:20 32:2
  33:9,15 43:8
**January** 1:15
jeans 27:21,22,23
job 12:2 31:19,23
  32:1,4,6 33:5
jobs 12:8 32:3
**July** 8:5,12,17,19
  9:23 25:21 30:15
  32:5,7,8 33:2
jumped 14:21 15:14

_____ K _____

keep 5:21
**Kenneth** 12:22,23
  37:3
**Kenneth's** 37:4
kept 11:8,9 39:4
kids 9:5
kind 6:3 10:4 13:18
  19:9 23:5 24:1,2
  28:20 30:5 33:1
  34:8 39:22
knew 43:16
know 5:14 6:6
  10:19 15:21 16:4
  16:5,16,23 17:1
  17:11,11,15,16,17
  17:20 22:1 23:4
  24:17 26:9,10,11
  26:13 27:8,10,12
  27:14 28:24 29:2
  29:8 33:10,12
  34:22 35:4,13,17
  35:18 36:2 39:16
  43:7,17,22

_____ L _____

lady 37:17 38:17
  43:4
lanyard 28:6
**LAW** 1:8,12 2:7
learned 35:9

**Lee** 17:18 21:20,22
left 10:10 14:1 37:4
  39:18
legal 42:3
**Lehigh** 10:12,13
**Let's** 11:20
letter 42:3
level 33:7
**License** 46:15
lieutenant 40:10,22
life 33:11 34:9
light 28:16
lighter 28:14
line 13:5,7
listed 41:21
**Listen** 16:13
little 5:6 43:16
live 7:15,23 8:6,24
  12:23,24 40:6
lived 7:18
located 11:17 40:2
lodged 44:19
long 7:18 8:2 13:16
  22:17,20 33:22
  38:1 39:14,18
  41:18 42:20
look 17:6 41:3
  42:12
looked 10:19 11:2
  15:16 17:5 36:9
  37:21
looking 16:10
looks 20:10
lost 8:15,18 31:19
  33:13
lot 5:14 31:9
lying 16:12

_____ M _____

M 1:16 46:14
mail 42:3
male 36:4,4
**March** 41:19
**Marked** 3:13
married 9:3
**Marshall** 13:2,10
  29:12,12
matter 29:23 46:7
**McDERMOTT** 2:3
  3:6 36:13,15 45:6
mean 40:9 43:23
means 46:19
medication 6:19
  34:16
medications 6:11
  6:15,20
mentally 33:10

Page 48

mentioned 22:2
metal 11:5
MICHAEL 2:3
middle 7:7,9
million 21:17
minutes 13:17,21
    14:1 20:20 42:24
missed 32:21
mistaken 8:9 39:15
money 25:22,23
month 31:5
months 8:3 21:5,6
    31:21 32:18
Moore 13:8
morning 18:11,16
    18:19
Morris 13:10,12
motioning 28:5
move 8:8,11
moved 7:21 8:9
Moving 20:7

**N**

N 3:1
name 4:14 7:2,4,7,9
    12:21 35:15,23
    37:2 41:16,16
    43:19 44:16
named 17:17 21:22
names 35:13,17
nature 33:17 38:15
nearby 39:20
neck 28:3,6
need 5:21
needed 12:5,7
neighborhood 29:5
    39:22 40:1
Nervous 21:16
never 11:15 26:10
    29:18 30:3,12
    40:14 44:5
night 8:22 9:23,24
    10:1,4 12:11 20:8
    36:16
nine 8:3
nod 5:23
north 8:1,7 13:1,4
    28:24 29:9,14,16
    29:24 37:19
notes 46:9
notice 43:13
noticed 15:2
noticing 42:21
number 7:13

**O**

objections 4:4

observed 14:12
occasionally 9:10
occurred 8:4
odd 12:8 32:3
odds 11:6 32:3
officer 10:17 11:3,4
    16:13 35:2,9,16
    35:22 38:14 39:5
    39:19
officers 4:17 10:22
    15:12,14,23 16:1
    17:9 35:2,12,19
    36:3,4 38:23
    39:10 40:8 41:1
    42:6 43:10,16,18
    43:21 44:3 45:1
offices 1:12
Okay 5:5,19 6:4,23
    8:21,24 9:23
    11:20 12:11 15:7
    16:18 17:17,20
    18:1 19:6,24 20:7
    22:2 25:17 26:19
    29:3,17 30:5,11
    32:1 35:13 36:1
    38:5 39:22 41:8
old 36:8
open 24:16 34:14
opportunity 44:10
opposed 5:23
Oral 1:11
organization 41:14
outcome 24:16
outfit 19:17 27:18
overtime 31:9

**P**

p.m 1:15 45:10
PA 7:17
PAGE 3:4,12
paid 25:11 27:5,9
    45:3
pair 19:16
pants 19:16
paperwork 21:22
    23:6 43:12
Park 18:2
parked 14:15,19
Parkway 1:13 2:8
parole 8:13 16:14
    22:3,4,5,7,17,19
    24:3,4,11 25:1
    27:4 33:5,14 43:2
    44:22
paroled 22:12
part 13:3 19:4 33:18
parties 4:2

partner 39:8
passed 29:8
pay 24:14,22,23,24
    25:1,4,5,6,12,12
    25:18,19 31:4
    44:18
paycheck 32:4
payoff 25:8 27:7,8
Pennsylvania 1:2
    1:14,22 2:4,10
people 11:5 35:4
    40:6
percent 24:23
period 32:20
person 17:17 42:17
Philadelphia 1:7,12
    1:14,22 2:4,7,10
    4:17 7:17 13:4
Phillies 18:4,5 20:5
    27:19,24 30:14,14
    31:7 41:13
Philly 37:20
photo 18:7 20:12
photograph 18:9
pick 24:14 33:15
piece 13:19
pill 34:10
pills 34:8
place 8:16
Plaintiff 1:5 2:5
played 33:18
point 11:19 16:7,19
    28:22
pointed 10:18
    15:18
pointing 10:20
    15:19
police 4:16 10:3,16
    14:10,12,18,20,24
    15:10,22 16:1
    19:19 21:21 24:12
    35:2,2,8,10,12,16
    35:19,22 36:3
    38:1 39:10 42:6
    43:1,16,17,20
    44:3 45:1
polo 18:5 27:20,23
position 32:10
possession 37:11
    37:14
possible 6:2
pressure 6:18 12:3
    34:10
pretty 39:15
prevent 6:12
previously 27:3
prior 7:23 23:16

28:19 36:21 42:20
prison 21:12
prisoner 27:3
probably 13:21
    32:6
probation 22:3,17
    23:10,12
proceedings 46:7
process 5:3
processed 20:10
    20:17,18
Professional 1:16
property 10:24
    27:14 37:9 38:11
    38:13,16
pull 15:10 28:20
    38:3
pulled 10:16,17
    14:15,19,20 15:10
    15:14 17:10,14
    37:19 38:4 42:21
pulling 37:22
pulls 37:20
put 9:14 13:18,24
    34:11,14,16

**Q**

quarrels 44:2
question 4:5 5:11
    5:15 6:5,7 16:21
    25:3
questioned 16:18
    16:22
questions 4:23,24
    16:24 36:12,14
    45:7

**R**

R.P.R 46:14
range 39:21
RAY 1:16 46:14
real 40:13
really 26:18 27:12
    33:9,18
reason 44:15
recall 23:7 28:13
    29:22 31:4,14
    43:6
received 23:12 42:3
recognize 17:23
    18:9 35:1 43:20
    43:23
recollection 23:4
record 6:2 7:3
    18:24 19:2 28:12
    32:13,15
red 20:5

reference 42:5
REFERENCED 3:12
refused 35:21
    40:21
Registered 1:16
regular 31:7
related 32:19
release 22:22 32:2
released 25:10,24
    26:7 31:22 33:4,4
remainder 26:24
remained 26:23
remark 40:13
remember 23:15,20
    23:21 25:20 29:11
    43:10
rephrase 6:6 35:5
report 35:18 41:15
reporter 1:17,17
    4:24 46:21
Reporters 1:21
REPORTING 1:21
represent 4:15
    21:20
reproduction 46:19
requested 35:20
requests 40:21
reserved 4:5
residence 8:18
residential 39:23
    40:1,5
resides 13:1
residing 7:16
respective 4:2
rest 21:10 34:9
result 32:21 34:21
right 7:1 11:21
    13:14 14:7 15:23
    16:7 18:5,14,16
    18:19,20 21:18
    25:16 26:3,17
    27:6,15,17 33:11
    38:3,4 40:23
    43:19
ring 35:15
robbery 22:8,10
    23:1,17,18,23
    24:3 44:23
roof 11:14 16:8,20
    17:4
roughly 7:19 32:18
route 29:19
runs 29:24 30:1

**S**

S 3:11
safe 37:20

A-65

Sam 41:17
sarcastic 40:13
sat 31:20
saw 15:10,12
saying 11:9 28:11
Scared 21:16
scrap 11:5
sealing 4:3
search 17:6 38:16
  38:19,24
searched 38:24
  39:2,20
second 10:17 32:13
seconds 14:20 38:2
Security 7:13
see 9:17 10:20 17:7
  28:21 36:24 40:8
  40:15 43:24 44:8
  44:10
seeing 28:19
seen 20:18 28:23
sending 20:20
sentence 27:16
September 22:21
serve 21:1 22:9
set 24:4,5,13,17,20
setting 5:17
shake 5:24
Sherwood 34:24
  35:7
shirt 18:5 19:3,6,9
  19:11,12,18 27:20
  27:23 28:14 35:20
  40:8,9,22
shopping 37:12
  42:7,10,12,14
shorter 39:12
shorthand 46:21
Shotland 2:8 3:5
  4:13,15 32:12,16
  36:11 45:8
show 31:20
side 38:21
significant 25:19
signing 4:2
similar 39:16
sitting 18:7
situation 24:2
six 21:6 31:21
skin 39:8
skinny 39:12
sleep 21:16 33:6
sleeping 19:18
small 38:20 40:2
smoothly 5:7
Social 7:13
somebody 15:20

40:10
somebody's 33:14
son 9:22
sort 15:15
source 9:20
south 29:24
speak 15:12 35:20
  40:14,17,18
spell 7:2
spelled 7:5,5
spent 14:1 20:8
  29:8
split 21:7
spoke 40:14
stable 33:16,17
stadium 12:8
Staffing 32:9
standing 10:21
  36:17 40:5
started 11:13 32:1
  32:5,8
state 7:2 8:13 24:11
  24:14,24 25:7
  27:3,4,6,9,14,16
  27:16 44:19
statement 44:13
STATES 1:1
status 24:1
stay 13:16 33:6
  38:23
stayed 9:2 27:6
  39:1,5
steady 30:16
stealing 17:21
  21:24 28:20 43:8
stenographic 46:9
stents 34:12
stipulated 4:1
stole 10:22
stolen 41:2
stop 10:8,15 15:7
  36:17
stopped 10:6,9
  14:10 37:17 41:6
  42:21
straight 30:3
street 1:13,22 2:3,9
  8:1,7,18,24 10:11
  10:13 13:2,5,7,10
  14:5,16,20 28:24
  29:2,4,7,9,10,12
  29:12,13,14,18,24
  30:2,4,8,9,9 37:5
  37:9 40:19,20
  42:22
stress 33:7
Stressed 21:13

stretch 31:8
string 28:9
struggling 34:22
stuff 11:5
sued 35:8
Suite 1:22 2:3
SUMMIT 1:21
supervision 46:20
supervisor 41:13
sure 5:22 31:3
surgery 34:13,14
Susquehanna
  29:14,15 30:1,2,3
  30:6
swipe 28:4
sworn 4:8

**T**
T 1:5,11 3:3,11 4:7
T-I-S-D-A-L-E 7:6
T-shirt 18:4 19:13
  19:14,15
tag 28:3,7
take 11:7 13:5
  19:23 20:21 24:15
  25:8 33:15 34:7
  34:16 37:8 41:1,3
  41:8
take-home 31:4
taken 6:11 26:20
  44:7,13 46:9
takes 33:12
talk 5:9
talked 15:23 32:17
  33:3
talking 15:17 16:5
  16:16 17:12 38:17
  42:5
taller 39:12
tank 19:19 20:8
tax 31:15
taxes 31:15
tell 23:6 38:6,9
  39:11
telling 10:23 16:22
  17:9
temp 9:12
Temple 34:3,4
ten 42:24
testified 4:8 26:16
  40:7
testify 6:21
testifying 6:12
testimony 46:6
Thank 36:12
Thanks 45:9
thing 27:7 28:9 38:7

things 5:6 21:15,17
  23:21 33:10,17
think 16:1 21:15,17
  25:9 27:9,22,23
  28:6 32:17 33:18
  38:21 41:16
thinking 15:20
thinners 6:18 34:8
three 7:19 9:16 13:8
  33:24
threw 11:14 16:7,19
  17:4
time 4:5 12:14,24
  14:1 18:16 20:12
  21:1,10 22:9 24:2
  26:24 28:23 29:9
  30:15,16 32:20
  33:11,15 36:21
  37:8,12,15 39:3
  39:14 41:21 42:18
  44:23 45:9
timeline 13:19
times 5:14 16:10
Timothy 34:24
  35:15
Tisdale 1:5,11 3:3
  4:7,14 7:4,5 32:17
  36:16
today 4:18 6:11,23
told 16:13 25:20,21
  25:22 26:1,11
  40:12 43:1,10
  45:1
tone 28:13
tools 11:15 41:9,11
tops 42:24
transcript 46:10
trial 1:3 4:5 8:15
tried 25:3
Trinity 32:9
trouble 16:14
true 46:10
try 5:10,24 6:1
  25:17
trying 6:3 13:18
  16:15 27:21 28:12
TV 20:19
twenties 36:9
twenty 13:11
two 9:18 20:23,23
  21:10 23:8 33:24
  35:11,18 36:2,4
  39:10 44:3
two-week 31:5
Tyrone 7:10

**U**

um-hmm 18:21
  22:24 23:13 34:18
underneath 17:5
understand 4:20
  5:12,13 6:5,9 24:1
  25:9 26:2 28:11
understood 6:7
  19:1
uniform 18:2 19:4
  19:11
uniformed 35:12,18
  36:3
UNITED 1:1
upset 11:13 17:2,3
upstate 24:15 25:8
  27:10
use 6:1 11:5

**V**

varied 31:10
varies 9:16,18
vary 31:6
ventured 30:12
verbal 5:22,23
vicinity 16:11 29:19
Videographers
  1:21
visited 12:18 13:13
visits 26:14
vs 1:6

**W**

wait 5:10
waiting 15:4,6
  36:19
waived 4:3
walk 14:4 29:10,23
walked 10:11,13
  13:9 29:18,24
  30:3,5
walking 10:10 15:5
  37:6
Walnut 1:22
want 5:9 16:13
  30:23
washing 12:4
wasn't 28:16
way 11:16 29:11
  33:13 39:21 43:15
  44:16
we're 4:21 8:4
  25:23
wearing 19:3,7,9,24
  27:19
week 9:17,17,18
  30:19,21,22 31:7
  31:13

DURANT T. TISDALE

| | | |
|---|---|---|
| **weeks** 7:19 20:23 20:24 21:10 33:8 33:24 | **Z** | **4** |
| **went** 11:3 12:18 13:10,13 16:21,24 26:17 27:9 29:11 29:13,14,15,15 30:3 33:7 41:14 | **0** | 4 3:5 |
| | **02161** 46:15 | **40** 31:7,12 |
| | | **447-8648** 1:23 |
| | **1** | **45** 13:21 |
| **west** 7:16,18,23 29:13,15 30:1 | **1:49** 1:15 | |
| **Whitaker** 35:22 | **10** 24:23 | **5** |
| **white** 35:20 36:4 39:6,7,9,10 40:8,9 40:22 | **10:00** 13:24 14:2 | **54** 10:12 |
| | **1026** 2:3 | **567-3315** 1:23 |
| | **10th** 30:9 | **5th** 8:19 9:23 21:3 |
| **Winter** 2:3 | **11th** 10:11,13,14 14:5 29:10,15,16 | |
| **withdrew** 26:13 | | **6** |
| **witness** 3:2 21:20 28:19 | **1242** 7:16 | **609** 1:23 |
| | **14th** 1:14 2:9 | **683-5434** 2:10 |
| **woman** 10:16,23 14:12 15:13 17:8 17:20 21:19 37:17 38:10 | **15** 39:21 | **6th** 8:5,17,22 13:9 13:10,11 21:4 |
| | **15-5209** 1:7 | |
| | **1500** 1:22 | **7** |
| | **1515** 1:13 2:9 | **7/2/60** 7:12 |
| **wondering** 25:11 | **1610** 1:22 | **70s** 10:7,7,8 |
| **word** 43:7,7 | **19102** 1:22 2:10 | **7th** 13:11 |
| **words** 6:1 | **19107** 2:4 | |
| **wore** 18:2 | **19133** 7:17 | **8** |
| **work** 5:17 9:10,14 9:16,18 10:6 11:6 11:23 12:15 13:20 16:14 24:10 27:11 30:14 31:12 32:21 40:3 41:14 | | **8** 1:15 |
| | **2** | **8:21** 18:18 |
| | **2,000** 24:21 | **800** 1:23 |
| | **2:41** 45:10 | **8th** 29:6 |
| | **20** 13:17 14:1 39:21 | |
| | **200** 2:3 25:5 | **9** |
| **worked** 10:5 11:20 | **2005** 13:1 | **9.50** 30:22,24 31:1 31:2 |
| **working** 18:3 30:16 31:6 32:2,8 41:18 | **2009** 22:13 | **9.55** 31:2 |
| | **2010** 41:19 | **9:00** 12:16 13:20 |
| **wouldn't** 24:24 25:6 25:10 29:19 33:20 40:15 | **2012** 8:10 | **9:30** 12:16 |
| | **2013** 8:5 9:23 26:5 30:15 31:15,16,23 33:2 | **925-9732** 2:4 |
| | | **985-2400** 1:23 |
| **writing** 4:24 5:8,17 | **2014** 31:18 | **9th** 29:13,14 30:1,8 |
| **www.summitrep...** 1:23 | **2015** 32:8 | |
| | **2016** 1:15 | |
| | **2017** 22:21 24:5 | |
| **X** | **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** 7:14 | |
| **X** 3:1,11 | **20th** 8:7,18,24 | |
| **XI** 46:15 | **2100** 29:6 | |
| | **215** 1:23 2:4,10 | |
| **Y** | **2200** 29:3 | |
| **Yeah** 16:9 19:23 30:7,18 31:11 | **2220** 28:24 29:9 | |
| | **23** 10:12 36:20 | |
| **year** 22:12 31:16 32:5,7 | **2341** 8:7 | |
| | **23rd** 29:4 | |
| **years** 22:11,15,22 23:17 | **25** 38:2 | |
| **York** 10:15 | **3** | |
| **young** 36:2 43:22 | **30** 13:17 14:1,20 20:19 38:2 | |
| **younger** 36:6 | **36** 3:6 | |
| | **3950** 8:1 | |

**SUMMIT COURT REPORTING, INC.**
**215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com**

A-67

# In The Matter Of:

*DURANT TYRONE TISDALE v.*

*CITY OF PHILADELPHIA- LAW DEPARTMENT, et al.*

---

## OFFICER TIMOTHY GIBSON

*January 14, 2016*  **ORIGINAL TRANSCRIPT**

---

*McDermott & Justice Reporting*

*1735 Market Street, Suite A 404*

*Philadlephia, PA 19103*

*215-925-4203*

Min-U-Script® with Word Index

A-68

## OFFICER TIMOTHY GIBSON

1

```
 1           IN THE COURT OF COMMON PLEAS
         PHILADELPHIA COUNTY, PENNSYLVANIA
 2                   -   -   -

 3   DURANT TYRONE TISDALE   :   CIVIL ACTION
                 Plaintiff  :
 4                          :
          V.                :
 5                          :
     CITY OF PHILADELPHIA-   :
 6   LAW DEPARTMENT and      :
     PHILADELPHIA POLICE     :
 7   OFFICER TIMOTHY GIBSON,:
     BADGE #4742             :
 8   and                     :
     PHILADELPHIA POLICE     :
 9   OFFICER DAVID SHERWOOD,:
     BADGE #714              :
10           Defendants   :   NO. 15-cv-5209

11                   -   -   -

12              January 14, 2016

13                   -   -   -

14          Oral deposition of OFFICER TIMOTHY

15   GIBSON, taken pursuant to notice, was held

16   at the City of Philadelphia-Law Department,

17   1515 Arch Street, 14th Floor, Philadelphia,

18   Pennsylvania 19102, commencing at 2:45 p.m.,

19   on the above date, before Susan B. Berkowitz,

20   a Registered Professional Reporter and

21   Notary Public in the Commonwealth of

22   Pennsylvania.

23                   -   -   -

24
```

A-69

```
 1    APPEARANCES:

 2

 3    MICHAEL I. McDERMOTT, ATTORNEY AT LAW
      BY:  MICHAEL I. McDERMOTT, ESQUIRE
 4    1026 Winter Street
      Philadelphia, Pennsylvania 19107
 5    Telephone:  (215) 925-9732
      E-mail:  mmcder1188@aol.com
 6    Counsel for Plaintiff

 7

 8    CITY OF PHILADELPHIA - LAW DEPARTMENT
      BY:  AARON SHOTLAND, ESQUIRE
 9    1515 Arch Street, Suite 14-A
      Philadelphia, Pennsylvania 19102
10    Telephone:  (215) 683-5434
      E-mail:  aaron.shotland@phila.gov
11    Counsel for Defendants

12

13    ALSO PRESENT:  OFFICER ROBERT WHITTAKER

14

15

16

17

18

19

20

21

22

23

24
```

A 70

```
 1              I N D E X
 2  Testimony of:  Officer Timothy Gibson
 3  By Mr. McDermott. . . . . . . . . 5, 39
 4  By Mr. Shotland. . . . . . . . . . 39
 5
 6
 7
 8
 9              -  -  -
10          E X H I B I T S
11              -  -  -
12
13  NO.          DESCRIPTION              PAGE
14
15  (There were no exhibits marked at this time.)
16
17
18
19
20
21
22
23
24
```

A-71

OFFICER TIMOTHY GIBSON                                    4

```
 1              DEPOSITION SUPPORT INDEX

 2

 3    Direction to Witness Not to Answer

 4    Page Line      Page Line      Page Line

 5    None

 6

 7

 8

 9    Request for Production of Documents

10    Page Line      Page Line      Page Line

11    None

12

13

14

15    Stipulations

16    Page Line      Page Line      Page Line

17     5    1-7

18

19

20

21    Question Marked

22    Page Line      Page Line      Page Line

23    None

24
```

A-72

```
 1              (It is hereby stipulated and
 2         agreed by and between counsel that
 3         signing, sealing, filing and
 4         certification are waived; and that
 5         all objections, except as to the
 6         form of questions, be reserved until
 7         the time of trial.)
 8                   -   -   -
 9         OFFICER TIMOTHY GIBSON, after
10         having been duly sworn, was examined
11         and testified as follows:
12                   -   -   -
13              EXAMINATION
14                   -   -   -
15    BY MR. McDERMOTT:
16         Q.   Officer, once again, my name is
17    Michael McDermott.  I represent Durant
18    Tisdale in this civil action in which you
19    are actually one of the named defendants.
20    So I'm going to be asking you questions
21    today in reference to what we call a
22    deposition.  And I think you told me
23    earlier you never had a deposition before.
24         A.   No, I have not.
```

A-73

OFFICER TIMOTHY GIBSON                        6

```
 1          Q.    How long have you been a police
 2    officer?
 3          A.    It will be six years next month.
 4          Q.    You read, write and understand
 5    the English language?
 6          A.    I do.
 7          Q.    I take it you've testified in
 8    cases in criminal court?
 9          A.    That's correct.
10          Q.    So here, a lot of the rules are
11    the same.  There's a stenographer to my
12    right.  You've been sworn in.  I'm going to
13    be asking you questions.  So I'll ask that
14    you wait until I finish my question before
15    you answer, because it makes it easier for
16    the stenographer to take everything down.
17                Do you understand that?
18          A.    Yes.
19          Q.    If you don't understand my
20    question, say, I'm sorry, I don't understand
21    your question.  If you don't recall or
22    remember the information I'm seeking, just
23    tell me, I don't recall.
24          A.    Okay.
```

## OFFICER TIMOTHY GIBSON

7

```
 1          Q.    And then maybe if you do recall
 2    something later in the deposition, if
 3    something comes into your mind, just let us
 4    know and we can go back to it.
 5          A.    Okay.
 6          Q.    Does that work for you?
 7          A.    Yes.
 8          Q.    Have you used any medication,
 9    narcotics or alcohol in the last 24 hours
10    that would keep you from understanding
11    anything I ask you today?
12          A.    No.
13          Q.    You're a Philadelphia police
14    officer?
15          A.    That's correct.
16          Q.    How long have you been a police
17    officer?
18          A.    It will be six years next month.
19          Q.    What is your current assignment?
20          A.    27 District.
21          Q.    What does that entail?
22          A.    10th to Kelly, Poplar to Lehigh.
23          Q.    So your normal tour of duty
24    consists of what?
```

A-75

1          A.    Me and my partner, Officer

2    Whittaker, are what they call 6p to -- 10p

3    to 6 -- or 10a to 6p.

4          Q.    So you're generally patrolling?

5          A.    Yeah, we are.

6          Q.    Are you guys on bicycles or are

7    you in cars?

8          A.    Sometimes on bikes, sometimes in

9    a patrol vehicle.

10          Q.    Back on the date of this

11    incident, which was July 5th, 2013, was the

12    same all true?

13          A.    We were in a marked police

14    vehicle.

15          Q.    But you were on the same

16    assignment, working together?

17          A.    Oh, yeah.

18          Q.    And who was the driver and who

19    was the radio man?

20          A.    I'm always the recorder.  Office

21    Whittaker is the driver.

22          Q.    Now, on that night you and

23    Officer Whittaker arrested Durant Tisdale.

24    Do you recall that?

1          A.    I recall that, after it was

2     brought to my attention, and looking at the

3     paperwork.  I did not remember him by name.

4          Q.    As you're talking to me, you

5     have a lot of paperwork in front of you,

6     which includes Mr. Tisdale's arrest photo,

7     right?

8          A.    That's correct.

9          Q.    And I noticed that you glanced

10    over that way, at least.  Did you see his

11    picture?

12         A.    I did.

13         Q.    Do you recognize it?

14         A.    Yes, I do.

15         Q.    And you recognize him from that

16    night?

17         A.    I do.

18         Q.    Is that how he looked on that

19    night?

20         A.    As far as I recall.

21         Q.    And you're patrolling.  I take

22    it that a radio call comes out at some point

23    in reference to the eventual arrest of Mr.

24    Tisdale?

A-77

```
 1            A.    That's right.

 2            Q.    What was the radio call?

 3            A.    It was a theft in progress on

 4    the 2100 block of North Delhi.

 5            Q.    You're referring to the 48?

 6            A.    I was.

 7            Q.    By the way, who prepared the 48?

 8            A.    That's my handwriting.

 9            Q.    We were just sitting here with

10    the detective, and he was reviewing the

11    paperwork.  But the actual 48 was prepared

12    by you?

13            A.    That's correct.

14            Q.    And that's in handwriting or

15    printing?

16            A.    That's my handwriting, that's

17    correct.

18            Q.    Tell us what the 48 states in

19    the narrative.

20            A.    Read it off directly?

21            Q.    Yes.

22            A.    Police received an R/C, which is

23    what I use for radio call; for a T-I-P, which

24
```

A-7-8

1  I use for theft in progress, at the

2  ABV, which would be the above location.

3  Flash given was a black male with a black

4  shirt, white hat.  Police observed below

5  witness and below offender at 1000 block

6  of Arizona.  Witness stated to police

7  that she observed offender take a white

8  grate to basement window from above

9  complainant property at the above

10 location.  Male placed under arrest,

11 transported to East Detectives.  Police

12 surveyed area for a grate, with negative

13 results.

14        Q.    Let's start with the above

15 location.  What was the location of the

16 theft?

17        A.    According to the witness, it

18 would have been 2220 North Delhi.

19        Q.    On the night of my client's

20 arrest, did you go to that address?

21        A.    I don't recall going to that

22 address; no.

23        Q.    Why didn't you go to the

24 address?

1          A.    Because I was with the defendant

2     and, also, the witness.  I don't know if my

3     partner did, or any other police personnel

4     did.

5          Q.    If you have a person under

6     arrest and they're in the patrol car, you're

7     out talking to the witness, is it abnormal

8     for your partner to leave you and go either

9     search for evidence or go see a location, a

10    crime scene?

11         A.    I guess it would depend on the

12    situation.

13         Q.    In this situation, you're saying

14    that that may have occurred, but I'd have to

15    ask Officer Whittaker?

16         A.    That's correct.

17         Q.    It does talk about searching

18    the area.  And do you recall, yourself,

19    searching the area?

20         A.    I recall walking down the 1000

21    block of Arizona to look for the grate,

22    which was the direction in which he was

23    coming from.

24         Q.    And that direction was given to

1  you by Brenda Lee?

2          A.    Well, no.  He was walking west

3  on the 1000 block of Arizona.

4          Q.    When you first saw him?

5          A.    Yeah, that's correct.

6          Q.    Okay.

7          A.    And he was just approaching --

8  it would be the intersection of Arizona and

9  11th Street.

10         Q.    Okay.

11         A.    So he was walking westbound.

12         Q.    Okay.  At the intersection of

13  Arizona and 11th Street, are there any bus

14  routes there or trolley routes?

15         A.    I can't recall if it's Arizona.

16  I think it's actually -- the bus would be at

17  11th and York, which would be half a block

18  up.  I think that's the closest one.

19         Q.    But the bus comes straight past

20  Arizona on --

21         A.    It goes northbound on -- past

22  Arizona.

23         Q.    So when you saw my client

24  walking, were you with the complainant or --

1   I'm sorry -- with the witness, Brenda Lee?

2        A.    No, we were not.

3        Q.    So you see my client walking,

4   but you don't go to stop him, do you?

5        A.    We stopped him.

6        Q.    Based on what?

7        A.    Based off the flash information

8   given over the police radio.

9        Q.    Give that to us again.

10       A.    It was a black male wearing a

11  black hat and a white -- I'm sorry, a white

12  hat and black shirt.

13       Q.    Was Mr. Tisdale wearing a black

14  shirt?

15       A.    Yeah.  I do recall that.

16       Q.    Was he wearing a white hat?

17       A.    As far as I recall; yes.

18       Q.    Did you put anything in your

19  report stating that he was, in fact, wearing

20  a white hat?

21       A.    In my 48A it gives the flash

22  information; why we stopped him.  If I had

23  the 48A in front of me, if one was prepared,

24  and I don't recall if one was prepared or

1   not, that would clearly state what he was

2   wearing.

3         Q.    For the record, tell me what a

4   48A is.

5         A.    48A is just the information of a

6   male that's stopped by police and the reason

7   they would be stopped.  I don't know if one

8   was prepared for this or not.

9         Q.    And how long have they been

10  actually preparing the 48As?

11        A.    I do not know.

12        Q.    Have they always been there

13  since you've been in the service of being a

14  Philadelphia police officer?

15        A.    That's correct.

16        Q.    So they're at least six years

17  old?

18        A.    Yeah.

19        Q.    So, obviously, then, on July 5th

20  of 2013, that's something that may have been

21  prepared?

22        A.    It may have been prepared.

23  Sometimes when the male is arrested based

24  off of flash information, sometimes one is

## OFFICER TIMOTHY GIBSON

16

```
 1   not prepared.
 2        Q.   Let me show you what's commonly
 3   referred to as the 229, the Biographical
 4   Information Report.
 5        A.   Sure.
 6        Q.   Do you recognize the handwriting
 7   on that report?
 8        A.   No, I do not.
 9        Q.   So it's not your handwriting?
10        A.   It's not.
11        Q.   And do you recognize it as being
12   Officer Whittaker's handwriting?
13        A.   I don't think so.
14        Q.   Who generally fills them out?
15        A.   The transporting officer, which
16   we were not.  We actually transported your
17   client, Durant Tisdale, to East Detectives.
18   So we would have came over and transported
19   the witness and then would have went down to
20   the cell and filled this out.
21        Q.   Wait.  I'm sorry.  You said
22   that, usually, the person who transports him
23   to --
24        A.   I mean -- I had that switched
```

A-84

1    up.  I think we transported the witness and

2    they transported -- what I'm trying to say

3    is, I don't know if this is Officer

4    Whittaker.

5         Q.   Okay.  So you think --

6         A.   I don't know if he did this or

7    if somebody else helped us transport Durant

8    Tisdale or Brenda Lee.

9         Q.   Okay.

10        A.   Sorry.

11        Q.   But your recollection -- your

12   best recollection, sitting here today, is

13   that you think you transported Brenda Lee?

14        A.   Now that I'm thinking about it,

15   I don't recall.  I don't know.

16        Q.   So let's get down to this.  What

17   does this have on it?  What kind of

18   information is the Philadelphia Biographical

19   Information Report looking for?

20        A.   Male's name, date of birth,

21   height and weight, approximately, address.

22        Q.   Is any information in there?

23        A.   Yes.

24        Q.   What information is in there?

```
 1          A.    His last name, his first name,
 2    date of birth.  He's a male, black,
 3    five-nine, 185, hair color gray, eye color
 4    brown, medium complexion, medium build, no
 5    glasses, goatee for facial hair.  He's
 6    single.  I think that says district
 7    residence would be the 39th, because his
 8    address is 301 West Erie Street, Philadelphia
 9    PA.  That location is a house.  He lives
10    alone.
11               Do you want me to read off his
12    Social Security number?
13          Q.    No.  That's not -- no.
14          A.    Occupation says NA.  Employer
15    address, NA.  Place of birth, Philadelphia,
16    PA.
17          Q.    Okay.  Now, do they have a spot
18    there where it would be filled in for a
19    description of the clothing worn by the
20    defendant?
21          A.    It does.  It has a spot for
22    clothing description.
23          Q.    And is that blank on that form?
24          A.    It is.
```

A-86

```
 1          Q.   And you can't tell us why that
 2   is, because you didn't prepare the report?
 3          A.   That's correct.
 4          Q.   Now, was there any physical
 5   evidence turned in by you or any other
 6   officer, that you're aware of, in reference
 7   to this arrest?
 8          A.   No, not that I'm aware of.
 9          Q.   And 1000 Arizona, that block,
10   are you familiar with it?
11          A.   Yeah.
12          Q.   Okay.  Are you familiar with the
13   neighborhood in which that block, and also
14   the block of 2200 North Delhi, is located?
15          A.   That's correct.
16          Q.   What kind of neighborhood is
17   that?  Is that a commercial spot?  Is that a
18   residential spot?
19          A.   It's primarily residential.
20          Q.   And you had patrolled it for
21   some time as of July 5th, 2013, right?
22          A.   That's correct.
23          Q.   What kind of people live there?
24   Is it all white?  Is it all black?  Is it a
```

```
 1   mixture?  Does it have Asians?  Does it have
 2   a lot of people, as far as you know from
 3   your patrol?
 4               MR. SHOTLAND:  If you can answer
 5          it.
 6               THE WITNESS:  I mean, I don't
 7          know how I can answer that.
 8   BY MR. McDERMOTT:
 9          Q.   Well, I mean, as far as you know
10   from being there on bike and in a patrol
11   car, do black people live there?
12          A.   That's correct.
13          Q.   And white people live there?
14          A.   I've seen -- yes.
15          Q.   By the way, Brenda Lee, was she
16   white?  Black?
17          A.   She was, I believe, a black
18   female, if I recall correctly.
19          Q.   And Brian Stewart, who I believe
20   it was reported that you spoke to on the
21   phone --
22          A.   Yes.
23          Q.   -- you never saw him, right?
24          A.   Can I refer to this (indicating)?
```

## OFFICER TIMOTHY GIBSON                21

1          Q.   Sure.

2          A.   I believe I did talk to him on

3      the phone.

4          Q.   Okay.

5          A.   (Witness reading.)  Yeah.  I

6      think I did talk to him on the phone.

7      That's correct.

8          Q.   So it's not unusual that a black

9      person, black male, would be walking down

10     the 1000 block of Arizona Street?

11         A.   No.

12         Q.   What time of night was this?

13         A.   Can I refer to this (indicating)?

14         Q.   Sure.  Your time out may be on

15     the --

16         A.   The time out is on the 48.  It

17     says 11:02 p.m.

18         Q.   So you're out on July 5th at

19     11:02 p.m.?

20         A.   That's correct.

21         Q.   And that time of night wouldn't

22     be unusual for a black person to be walking

23     down the street?

24         A.   No.

A 89

1          Q.    And you stopped Mr. Tisdale

2    because you say that he fit the description

3    that you have in the 48?

4          A.    That's correct.

5          Q.    Okay.

6          A.    Which was provided by police

7    radio.

8          Q.    And what was it?

9          A.    For a black male with a black

10   shirt and white hat.  That's what I recall

11   from that radio call.

12         Q.    What kind of hat was it?

13         A.    I don't recall.

14         Q.    So there wasn't a height

15   description given.  There wasn't a weight

16   description given, right?

17         A.    If there was, I don't recall.

18         Q.    But you didn't write anything

19   down in your 48?

20         A.    I did not.

21         Q.    And you write down what's given

22   over the police radio?

23         A.    I'm sorry?

24         Q.    You write down what description

A 90

1    is given over the police radio?

2         A.    That's correct.

3         Q.    So when did you actually fill

4    out the 48?

5         A.    Before going to Detectives,

6    after the incident.

7         Q.    Out on the street or back in the

8    station?

9         A.    I wrote this, I believe, on the

10   street.

11        Q.    So you have the 48s with you

12   in this car?

13        A.    Yes, in the car.

14        Q.    So that would be fresh in your

15   memory?

16        A.    That's correct.

17        Q.    What time did you go in?  I know

18   that a 48 has a time out and a time in.

19        A.    Time in?

20             MR. SHOTLAND:  It's just the

21        next --

22             THE WITNESS:  11:25.

23   BY MR. McDERMOTT:

24        Q.    You wrote this all within 20

```
 1 | minutes?
 2 |        A.    That's correct.
 3 |        Q.    So you would have remembered at
 4 | that time what the description was?
 5 |        A.    That's correct.
 6 |        Q.    Okay.  Was Mr. Tisdale carrying
 7 | anything?
 8 |        A.    Not that I recall.
 9 |        Q.    Did Mr. Tisdale have any tools
10 | on him?
11 |        A.    From what I recall, no.
12 |        Q.    Was he pushing a shopping cart?
13 |        A.    If he was, I don't recall that.
14 |        Q.    So what you're telling me is you
15 | stopped Mr. Tisdale?
16 |        A.    That's correct.
17 |        Q.    You're in uniform?
18 |        A.    That's correct.
19 |        Q.    Officer Whittaker is in uniform?
20 |        A.    That's correct.
21 |        Q.    How do you approach him?  Do you
22 | just pull up to where he is and ask him to
23 | stop?
24 |        A.    As far as I recall, we stopped
```

```
 1   him at Arizona and 11th.

 2        Q.   Okay.  But you're in your car?

 3        A.   That's correct.

 4        Q.   So you put down your window and

 5   say stop?  You get out and start talking to

 6   him?

 7        A.   I don't recall if we pulled up

 8   next to him, in front of him.  I don't

 9   recall.

10        Q.   But you're there in uniform in

11   the car somewhere.  Do you have the lights

12   on in the car?

13        A.   No.

14        Q.   Okay.  When Brenda Lee first

15   comes onto the scene, how do you become

16   aware that she's there?

17        A.   If I can refer to this.

18   (Witness reading.)  After we stopped Mr.

19   Tisdale, Brenda Lee came up and stated that

20   she observed Mr. Tisdale take the grate from

21   2220 North Delhi.

22        Q.   And was she on foot?  Was she

23   in a car?

24        A.   I believe I recall the first
```

1    time I saw her she was on foot.

2         Q.    Okay.

3         A.    At least walking towards us.  I

4    don't know if she drove there or --

5         Q.    And she told you that she

6    followed him?

7         A.    That is correct.  She stated --

8    well, to me, she stated that she observed

9    him take the grate from the property.  I

10   don't remember her saying she followed him,

11   or she came around the block and saw him.  I

12   didn't get that into it with her.

13        Q.    Did you ask her where the grate

14   is?

15        A.    I don't recall if I did.

16   However, we did survey for it.  So I don't

17   know.  I don't recall.

18        Q.    Did you ask Mr. Tisdale where

19   the grate was?

20        A.    I don't recall.

21        Q.    Did he state anything to you

22   about the grate?

23        A.    Not that I recall.

24        Q.    What, if anything, did he state

1    to you?

2          A.    Nothing, from what I can recall.

3          Q.    He just stated what?

4          A.    Nothing that I can recall, off

5    the top of my head.

6          Q.    When did you actually put him in

7    handcuffs, you or Officer Whittaker,

8    whichever one did it?

9          A.    I believe we placed him in

10   custody after learning the information from

11   Mrs. Lee.

12         Q.    When you first stopped him,

13   Brenda Lee was not on site?

14         A.    I believe she was behind,

15   walking up.  It was relatively quick, from

16   what I remember.  I don't recall how quick,

17   but I remember it was relatively quick.

18         Q.    Why did you stop him?

19         A.    Once again, based off of flash

20   information given by police radio.

21         Q.    And what was your thinking about

22   the grate?

23         A.    What do you mean?

24         Q.    I mean, didn't it cross your

1    mind that, I'm being told that this man

2    stole a grate and put it in a shopping cart,

3    and he's pushing it down the block?  Didn't

4    you think to yourself, what happened to the

5    grate, where is the grate?

6          A.    Well, that's why we surveyed the

7    area with negative results.  And at that

8    point, based on the witness' statement to

9    us, we placed him in custody and took the

10   male to East Detectives for further

11   processing or investigation at that point.

12         Q.    Well, a lot of times in court,

13   in reference to location and things, we talk

14   about location, and it's often said it was

15   the 1000 block of Arizona Street or the 100

16   block of Market Street.

17         A.    Sure.

18         Q.    They're only talking about one

19   block, the 1000 block, right?

20         A.    The 1000 block of Arizona.

21         MR. SHOTLAND:  Objection to

22   form.  What's the question?

23         MR. McDERMOTT:  Well, I'm going

24   to ask him a question.

A-96

## OFFICER TIMOTHY GIBSON          29

```
 1    BY MR. McDERMOTT:

 2         Q.    So you already surveyed that one

 3    block?

 4         A.    No.

 5         Q.    What else did you survey?

 6         A.    I believe while we were

 7    responding to the radio call, we were -- I

 8    believe we were traveling north on 11th

 9    Street when we observed the male.

10         Q.    Okay.  Did you leave the 1100

11    block?

12         A.    That was -- no.  11th Street,

13    like I stated earlier, runs northbound.

14         Q.    It's one way?

15         A.    That's correct.  And Arizona

16    runs right into 11th Street.

17         Q.    So you're going northbound on

18    11th Street?

19         A.    As far as I recall; yes.

20         Q.    And you said that the defendant

21    was walking westbound on Arizona?

22         A.    As far as I recall.

23         Q.    So the first time you saw him

24    was when you got to the intersection?
```

1          A.    That's correct.

2          Q.    And he's up on your right?

3          A.    He would have been on our right;

4    yeah.

5          Q.    So you had to make a right-hand

6    turn and then you come in contact with him?

7          A.    Once again, like I said, how we

8    approached him -- I don't recall if we

9    turned to face him, or we just stopped and I

10   got off on the side.   I don't recall if he

11   was at the intersection of Arizona and 11th

12   Street, which is the 1000 block of Arizona,

13   which is where we stopped him for

14   investigation.

15         Q.    Okay.   So I guess the

16   appropriate question is:   From the time you

17   saw him, until the time you were with him,

18   there was no great distance to cross?

19         A.    No, not at all.

20         Q.    And when you're sitting there,

21   looking to your right and you see him, and

22   you get out of your car, you don't see this

23   lady walking?   Brenda Lee?

24         A.    Well, I recall going to stop

A-98

1   him; and then once we stopped him, Mrs. Lee

2   coming up and telling us what she saw.

3        Q.    So then the question is:  What

4   was your survey area, for purposes of

5   looking for a shopping cart and/or a grate?

6        A.    I don't recall.  It was three

7   years ago.  I remember going northbound on

8   11th Street and then approaching the male

9   for investigation.

10        Q.    So your survey was done on foot

11   or in a car?

12        A.    We were in a marked police

13   vehicle.

14        Q.    So you were driving around

15   looking for it?

16        A.    My partner, Officer Whittaker,

17   was driving, and I was in the recorder seat.

18        Q.    After you arrested him, he's in

19   the car and you're looking for the grate?

20        A.    I said we surveyed, with

21   negative results.  I don't want to --

22        Q.    I know.  But I mean --

23        A.    I remember walking down the

24   street at that point.  I don't know what

1  other police personnel surveyed where.  I

2  remember walking down at one point.  I

3  didn't find it.  Nobody else found anything.

4  That's why I stated "survey done with

5  negative results."

6      Q.   Okay.  And that's all I'm

7  asking, is how far you actually went.

8      A.   That's all I know.

9      Q.   So, for you, it was on foot,

10  walking?

11      A.   I walked down Arizona and came

12  right back.

13      Q.   So you didn't even reach the

14  next intersection?

15      A.   If I did, I don't remember.

16      Q.   And you brought Mr. Tisdale into

17  the precinct?

18      A.   Once again, I don't recall who

19  transported him.

20      Q.   I apologize.  I understand that.

21  I mean, at this point after arresting him,

22  based on what she told him, you take him

23  into the precinct, or go along with people

24  that are taking him into the precinct?

A-100

```
 1   Everybody comes back --
 2         A.    That's right.  Due to the
 3   occurrence of this, it would have occurred
 4   at 2220 North Delhi.  We took him to East
 5   Detectives.
 6         Q.    So the only thing that you had
 7   to rely on, that he was, in fact, the person
 8   that stole something was what?  Ms. Brenda
 9   Lee's statement?
10         A.    That's correct.
11               MR. SHOTLAND:  Objection.
12               You can answer.
13               THE WITNESS:  That's correct.
14   BY MR. McDERMOTT:
15         Q.    And you had no other physical
16   evidence to support her claims?
17         A.    Other than why we stopped the
18   male for the black shirt, white hat; due to
19   information given over police radio, and
20   what Mrs. Lee -- is it Lee -- yeah, stated
21   to us.
22         Q.    And being in the general area?
23         A.    Well, we were in the general
24   area because of the radio call.
```

1          Q.   No.  I mean my client being in

2     the general area.

3          A.   Where we stopped him for

4     investigation.  That's right.

5          Q.   How far is that from the 2200

6     block of North Delhi?

7          A.   I'd say, approximately, four

8     blocks.  Because like I stated earlier, it's

9     closer to 11th and York.  And 2200 Delhi

10    would be north of Susquehanna.  I can't

11    remember if Delhi is between 9th and 10th

12    or 8th and 9th.

13         Q.   So you get the radio call at

14    11:05?

15         A.   My 48 says 11:02.

16         Q.   11:02.

17         A.   I don't recall.  But if the 48

18    says 11:02...

19         Q.   What time is it when you spot

20    Mr. Tisdale?

21         A.   I don't recall.

22         Q.   Is he sweating or anything?

23         A.   I don't recall.

24         Q.   Do you recall whether it was a

35

```
 1   hot night, warm night, cold night?
 2        A.    I don't recall.  It's three
 3   years ago.
 4        Q.    What training have you had
 5   through the police department for probable
 6   cause?
 7        A.    For probable cause?
 8        Q.    Yes.
 9        A.    Based off what we learned in the
10   Philadelphia Police Academy.
11        Q.    What did they tell you?
12        A.    About probable cause?
13        Q.    Yes.
14             MR. SHOTLAND:  To the best of
15        your recollection.
16             THE WITNESS:  By definition, I
17        don't recall, but -- I really don't
18        know what you're asking here, sir.
19   BY MR. McDERMOTT:
20        Q.    Well, do you know what probable
21   cause is?
22        A.    Yes.
23        Q.    Okay.
24        A.    It's reason to believe that a
```

A-103

```
1   crime is committed.

2          Q.   How did you learn that?

3          A.   Based on the statement that Mrs.

4   Lee gave to us.

5          Q.   I mean, how did you learn the

6   definition that you just gave us?

7          A.   At the Academy.

8          Q.   And what did that training

9   consist of?

10         A.   33 weeks.

11         Q.   And how much of that 33 weeks

12  was spent on probable cause?

13         A.   I don't know.  I'm not an

14  instructor.

15         Q.   Was it more than one class?

16         A.   Yes.

17         Q.   Was it more than one week?

18         A.   There was 33 weeks.  I don't

19  know what was spent on probable cause.

20         Q.   But the best definition you can

21  give from your training is what you just

22  gave us?

23         A.   That's correct.

24         Q.   And based on that training, her
```

1   telling you that she saw him do something

2   was enough for you?

3         A.    Based off of my training and my

4   experience, yes, to take it, at least, to

5   East Detectives.

6         Q.    What experience comes into play?

7         A.    Three years, prior to this

8   incident, being an officer.

9         Q.    Well, what experience did you

10  have, that arresting somebody for walking

11  down the street that has a black shirt and a

12  white hat on --

13              MR. SHOTLAND:  Objection.

14  BY MR. McDERMOTT:

15        Q.    How many times have you arrested

16  people for somebody saying they did

17  something without any further evidence?

18        A.    Multiple times.

19        Q.    Multiple times?

20        A.    That's correct.

21        Q.    Did you go to court for this?

22        A.    I believe so.

23        Q.    Did you ever testify?

24        A.    I don't recall.

1          Q.    Did you ever see Brenda Lee

2    again?

3          A.    Not that I recall.

4          Q.    Did you ever meet Brian Stewart

5    or see him in court?

6          A.    I never was introduced to him;

7    no.

8          Q.    You're aware that Mr. Tisdale's

9    case was dismissed --

10         A.    I've heard.

11         Q.    -- for lack of prosecution?

12         A.    Okay.

13         Q.    You've had some complaints

14    brought against you before?

15              MR. SHOTLAND:  Neither of those

16         have anything to do with an arrest

17         or a false arrest or malicious

18         prosecution.  I just don't know how

19         they're relevant.

20              MR. McDERMOTT:  Give me one

21         minute.  I didn't look at it.

22              MR. SHOTLAND:  Take a look at

23         it.  They're two off-duty incidents.

24              (Counsel reading the document.)

A-106

1          MR. McDERMOTT:  I have no

2      questions, based on what I've had

3      the opportunity to see.  So I have

4      no further questions.

5          Thanks, Officer.

6          MR. SHOTLAND:  I do, just very

7      briefly.

8              -   -   -

9          EXAMINATION

10             -   -   -

11  BY MR. SHOTLAND:

12      Q.   You spoke with Brenda Lee at the

13  arrest scene?

14      A.   I did.

15      Q.   Did she give you any reason to

16  believe that she was lying to you?

17      A.   No, she did not.

18          MR. SHOTLAND:  That's my only

19      question.

20              -   -   -

21          EXAMINATION

22              -   -   -

23  BY MR. McDERMOTT:

24      Q.   You never asked her what he did

1    with the grate?

2        A.    Not that I recall; no.

3        Q.    In your experience as a

4    Philadelphia police officer, what does your

5    experience say that if you stole a grate it

6    has to be somewhere?

7        A.    Which is why I surveyed, with

8    negative results.

9        Q.    But wouldn't it be your

10   experience and common sense to tell you,

11   hey, let's ask the witness who saw him take

12   it?

13       A.    Wouldn't it be common sense to

14   believe that from the 2200 block of Delhi

15   and Arizona that he could have put that

16   grate anywhere?

17       Q.    Such as where?

18       A.    I don't know.

19       Q.    But if somebody is following

20   him, still, wouldn't it be reasonable and

21   common sense to ask an eyewitness, Did you

22   see where he put the grate?

23       A.    You would have to ask Mrs. Lee

24   that.   I don't know if she followed him the

```
 1   whole way.
 2          Q.   I'm asking why you wouldn't ask
 3   that question.
 4              MR. SHOTLAND:  Objection.  He
 5          didn't say he didn't ask her.  He
 6          said he didn't remember.  There's a
 7          difference.
 8   BY MR. McDERMOTT:
 9          Q.   You don't recall asking her?
10          A.   I don't recall if I did.
11          Q.   But don't you think that with
12   three years' experience on the job, you
13   would ask a witness, Hey, do you know what
14   he did with the grate?
15              MR. SHOTLAND:  Objection.
16              THE WITNESS:  Yes.  But, once
17          again, I don't recall if I asked her
18          that.
19   BY MR. McDERMOTT:
20          Q.   Okay.  Let me see your statement.
21          A.   Sure.
22          Q.   Thanks.  In this, you have:  I
23   was working with my partner, Police Officer
24   Whittaker, in full uniform, and operating a
```

A-109

1  marked police vehicle.  We received a radio

2  call of a theft in progress from 2200 Delhi.

3           Right?

4       A.   That's correct.

5       Q.   Flash information.  Flash given

6  was a black male wearing a black shirt and

7  white hat, last seen in the area of 10th and

8  Dakota.

9           Where is Dakota?

10      A.   I can't recall if it's a

11 half-block south or north of Arizona.

12      Q.   Okay.  Well, Arizona runs west

13 and east, right?

14      A.   No.  They're one-way streets.  I

15 forget if Dakota runs east or west, and

16 Arizona -- they run -- one goes east and one

17 goes west.  I don't recall which one is

18 which.

19      Q.   So it's either --

20      A.   But they're both, I believe,

21 one-way streets.

22      Q.   So it's either south or north?

23      A.   No.  They both -- no.  Both

24 Dakota and Arizona would either run east or

```
 1    west.  I just don't remember exactly which
 2    one is east and which one is west.
 3            Q.    Where is --
 4            A.    They're both perpendicular to
 5    11th Street.
 6            Q.    Where is 10th and Dakota in
 7    reference to 2200 North Delhi and 11 -- or
 8    1000 Arizona?
 9            A.    Well, like I said, Dakota is
10    either -- I can't remember if it's half a
11    block north or south of Arizona.  But that
12    would be like -- 10th and Dakota would be
13    like the 10th and York area.
14            Q.    And then it says:  We surveyed
15    the area and observed the defendant and
16    witness at 11000 Arizona Street.
17            A.    No.  1000.
18            Q.    I'm sorry.  1000 Arizona.
19                  "Upon investigation, the witness
20    stated to police that she observed the
21    defendant take a white grate from the
22    basement window at 2220 Delhi Street."
23                  And based on reading that,
24    you're telling me you don't recall whether
```

A-111

```
1   you asked her what he did with the grate?

2          A.    That's correct.

3                MR. McDERMOTT:   I have no other

4          questions.

5                MR. SHOTLAND:   Nothing.

6                (Witness excused.)

7                    -   -   -

8                (Whereupon, the deposition

9          concluded at 3:15 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

A-112

1                    CERTIFICATE

2              I HEREBY CERTIFY that the witness was

3    duly sworn by me and that the deposition is

4    a true record of the testimony given by the

5    witness.

6

7

8

9

10   ------------------------------------
     Susan B. Berkowitz, a
11   Registered Professional Reporter
     and Notary Public
12   Dated:   January 25, 2016

13

14

15

16

17              (The foregoing certification

18   of this transcript does not apply to any

19   reproduction of the same by any means,

20   unless under the direct control and/or

21   supervision of the certifying

22   reporter.)

23

24

Case: 16-1874 Document: 003112405483 Page: 115 Date Filed: 09/12/2016

DURANT TYRONE TISDALE V.
CITY OF PHILADELPHIA- LAW DEPARTMENT, et al.

OFFICER TIMOTHY GIBSON
January 14, 2016

## A

abnormal (1)
12:7
above (4)
11:2,8,9,14
ABV (1)
11:2
Academy (2)
35:10;36:7
According (1)
11:17
action (1)
5:18
actual (1)
10:11
actually (7)
5:19;13:16;15:10;
16:16;23:3;27:6;32:7
address (6)
11:20,22,24;17:21;
18:8,15
again (7)
5:16;14:9;27:19;
30:7;32:18;38:2;
41:17
against (1)
38:14
ago (2)
31:7;35:3
agreed (1)
5:2
alcohol (1)
7:9
alone (1)
18:10
along (1)
32:23
always (2)
8:20;15:12
and/or (1)
31:5
apologize (1)
32:20
approach (1)
24:21
approached (1)
30:8
approaching (2)
13:7;31:8
appropriate (1)
30:16
approximately (2)
17:21;34:7
area (11)
11:12;12:18,19;
28:7;31:4;33:22,24;
34:2;42:7;43:13,15
Arizona (27)
11:6;12:21;13:3,8,
13,15,20,22;19:9;
21:10;25:1;28:15,20;

29:15,21;30:11,12;
32:11;40:15;42:11,
12,16,24;43:8,11,16,
18
around (2)
26:11;31:14
arrest (9)
9:6,23;11:10,20;
12:6;19:7;38:16,17;
39:13
arrested (4)
8:23;15:23;31:18;
37:15
arresting (2)
32:21;37:10
Asians (1)
20:1
assignment (2)
7:19;8:16
attention (1)
9:2
aware (4)
19:6,8;25:16;38:8

## B

back (5)
7:4;8:10;23:7;
32:12;33:1
Based (12)
14:6,7;15:23;
27:19;28:8;32:22;
35:9;36:3,24;37:3;
39:2;43:23
basement (2)
11:8;43:22
become (1)
25:15
behind (1)
27:14
below (2)
11:4,5
best (3)
17:12;35:14;36:20
bicycles (1)
8:6
bike (1)
20:10
bikes (1)
8:8
Biographical (2)
16:3;17:18
birth (3)
17:20;18:2,15
black (20)
11:3,3;14:10,11,12,
13;18:2;19:24;20:11,
16,17;21:8,9,22;22:9,
9;33:18;37:11;42:6,6
blank (1)
18:23
block (22)
10:4;11:5;12:21;

13:3,17;19:9,13,14;
21:10;26:11;28:3,15,
16,19,19,20;29:3,11;
30:12;34:6;40:14;
43:11
blocks (1)
34:8
both (4)
42:20,23,23;43:4
Brenda (12)
13:1;14:1;17:8,13;
20:15;25:14,19;
27:13;30:23;33:8;
38:1;39:12
Brian (2)
20:19;38:4
briefly (1)
39:7
brought (3)
9:2;32:16;38:14
brown (1)
18:4
build (1)
18:4
bus (3)
13:13,16,19

## C

call (10)
5:21;8:2;9:22;10:2,
23;22:11;29:7;33:24;
34:13;42:2
came (3)
16:18;25:19;26:11;
32:11
can (10)
7:4;20:4,7,24;
21:13;25:17;27:2,4;
33:12;36:20
car (11)
12:6;20:11;23:12,
13;25:2,11,12,23;
30:22;31:11,19
carrying (1)
24:6
cars (1)
8:7
cart (3)
24:12;28:2;31:5
case (1)
38:9
cases (1)
6:8
cause (6)
35:6,7,12,21;36:12,
19
cell (1)
16:20
certification (1)
5:4
civil (1)
5:18

13:3,17;19:9,13,14;
21:10;26:11;28:3,15,
16,19,19,20;29:3,11;
30:12;34:6;40:14;
43:11
claims (1)
33:16
class (1)
36:15
clearly (1)
15:1
client (4)
13:23;14:3;16:17;
34:1
client's (1)
11:19
closer (1)
34:9
closest (1)
13:18
clothing (2)
18:19,22
cold (1)
35:1
color (2)
18:3,3
coming (2)
12:23;31:2
commercial (1)
19:17
committed (1)
36:1
common (3)
40:10,13,21
commonly (1)
16:2
complainant (2)
11:9;13:24
complaints (1)
38:13
complexion (1)
18:4
concluded (1)
44:9
consist (1)
36:9
consists (1)
7:24
contact (1)
30:6
correctly (1)
20:18
counsel (2)
5:2;38:24
court (4)
6:8;28:12;37:21;
38:5
crime (2)
12:10;36:1
criminal (1)
6:8
cross (2)
27:24;30:18
current (1)
7:19
custody (2)
27:10;28:9

## D

Dakota (7)
42:8,9,15,24;43:6,
9,12
date (3)
8:10;17:20;18:2
defendant (5)
12:1;18:20;29:20;
43:15,21
defendants (1)
5:19
definition (3)
35:16;36:6,20
Delhi (12)
10:4;11:18;19:14;
25:21;33:4;34:6,9,
11;40:14;42:2;43:7,
22
department (1)
35:5
depend (1)
12:11
deposition (4)
5:22,23;7:2;44:8
description (7)
18:19,22;22:2,15,
16,24;24:4
detective (1)
10:10
Detectives (6)
11:11;16:17;23:5;
28:10;33:5;37:5
difference (1)
41:7
direction (2)
12:22,24
directly (1)
10:20
dismissed (1)
38:9
distance (1)
30:18
District (2)
7:20;18:6
document (1)
38:24
done (2)
31:10;32:4
down (15)
6:16;12:20;16:19;
17:16;21:9,23;22:19,
21,24;25:4;28:3;
31:23;32:2,11;37:11
driver (2)
8:18,21
driving (2)
31:14,17
drove (1)
26:4
Due (2)
33:2,18

Case: 16-1874   Document: 003112405483   Page: 116   Date Filed: 09/12/2016

DURANT TYRONE TISDALE v.                                    OFFICER TIMOTHY GIBSON
CITY OF PHILADELPHIA- LAW DEPARTMENT, et al.                        January 14, 2016

duly (1)
5:10
Durant (4)
5:17;8:23;16:17;
17:7
duty (1)
7:23

**E**

earlier (3)
5:23;29:13;34:8
easier (1)
6:15
East (10)
11:11;16:17;28:10;
33:4;37:5;42:13,15,
16,24;43:2
either (5)
12:8;42:19,22,24;
43:10
else (3)
17:7;29:5;32:3
Employer (1)
18:14
English (1)
6:5
enough (1)
37:2
entail (1)
7:21
Erie (1)
18:8
even (1)
32:13
eventual (1)
9:23
Everybody (1)
33:1
evidence (4)
12:9;19:5;33:16;
37:17
exactly (1)
43:1
EXAMINATION (3)
5:13;39:9,21
examined (1)
5:10
except (1)
5:5
excused (1)
44:6
experience (7)
37:4,6,9;40:3,5,10;
41:12
eye (1)
18:3
eyewitness (1)
40:21

**F**

face (1)

30:9
facial (1)
18:5
fact (2)
14:19;33:7
false (1)
38:17
familiar (2)
19:10,12
far (9)
9:20;14:17;20:2,9;
24:24;29:19,22;32:7;
34:5
female (1)
20:18
filing (1)
5:3
fill (1)
23:3
filled (2)
16:20;18:18
fills (1)
16:14
find (1)
32:3
finish (1)
6:14
first (6)
13:4;18:1;25:14,
24;27:12;29:23
fit (1)
22:2
five-nine (1)
18:3
Flash (7)
11:3;14:7,21;
15:24;27:19;42:5,5
followed (3)
26:6,10;40:24
following (1)
40:19
follows (1)
5:11
foot (4)
25:22;26:1;31:10;
32:9
forget (1)
42:15
form (3)
5:6;18:23;28:22
found (1)
32:3
four (1)
34:7
fresh (1)
23:14
front (3)
9:5;14:23;25:8
full (1)
41:24
further (3)
28:10;37:17;39:4

**G**

gave (3)
36:4,6,22
general (3)
33:22,23;34:2
generally (2)
8:4;16:14
GIBSON (1)
5:9
given (10)
11:3;12:24;14:8;
22:15,16,21;23:1;
27:20;33:19;42:5
gives (1)
14:21
glanced (1)
9:9
glasses (1)
18:5
goatee (1)
18:5
goes (3)
13:21;42:16,17
grate (21)
11:8,12;12:21;
25:20;26:9,13,19,22;
27:22;28:2,5,5;31:5,
19;40:1,5,16,22;
41:14;43:21;44:1
gray (1)
18:3
great (1)
30:18
guess (2)
12:11;30:15
guys (1)
8:6

**H**

hair (2)
18:3,5
half (2)
13:17;43:10
half-block (1)
42:11
handcuffs (1)
27:7
handwriting (6)
10:8,14,16;16:6,9,
12
happened (1)
28:4
hat (10)
11:4;14:11,12,16,
20;22:10,12;33:18;
37:12;42:7
head (1)
27:5
heard (1)
38:10

height (2)
17:21;22:14
helped (1)
17:7
hereby (1)
5:1
hey (2)
40:11;41:13
hot (1)
35:1
hours (1)
7:9
house (1)
18:9

**I**

incident (3)
8:11;23:6;37:8
incidents (1)
38:23
includes (1)
9:6
indicating (2)
20:24;21:13
information (14)
6:22;14:7,22;15:5,
24;16:4;17:18,19,22,
24;27:10,20;33:19;
42:5
instructor (1)
36:14
intersection (5)
13:8,12;29:24;
30:11;32:14
into (7)
7:3;26:12;29:16;
32:16,23,24;37:6
introduced (1)
38:6
investigation (5)
28:11;30:14;31:9;
34:4;43:19

**J**

job (1)
41:12
July (4)
8:11;15:19;19:21;
21:18

**K**

keep (1)
7:10
Kelly (1)
7:22
kind (4)
17:17;19:16,23;
22:12

**L**

lack (1)
38:11
lady (1)
30:23
language (1)
6:5
last (3)
7:9;18:1;42:7
later (1)
7:2
learn (2)
36:2,5
learned (1)
35:9
learning (1)
27:10
least (4)
9:10;15:16;26:3;
37:4
leave (2)
12:8;29:10
Lee (17)
13:1;14:1;17:8,13;
20:15;25:14,19;
27:11,13;30:23;31:1;
33:20,20;36:4;38:1;
39:12;40:23
Lee's (1)
33:9
Lehigh (1)
7:22
lights (1)
25:11
live (3)
19:23;20:11,13
lives (1)
18:9
located (1)
19:14
location (8)
11:2,10,15,15;
12:9;18:9;28:13,14
long (3)
6:1;7:16;15:9
look (3)
12:21;38:21,22
looked (1)
9:18
looking (6)
9:2;17:19;30:21;
31:5,15,19
lot (4)
6:10;9:5;20:2;
28:12
lying (1)
39:16

**M**

makes (1)

Case: 16-1874   Document: 003112405483   Page: 117   Date Filed: 09/12/2016

DURANT TYRONE TISDALE v.
CITY OF PHILADELPHIA- LAW DEPARTMENT, et al.

OFFICER TIMOTHY GIBSON
January 14, 2016

6:15
**male (13)**
    11:3,10;14:10;
    15:6,23;18:2;21:9;
    22:9;28:10;29:9;
    31:8;33:18;42:6
**Male's (1)**
    17:20
**malicious (1)**
    38:17
**man (2)**
    8:19;28:1
**many (1)**
    37:15
**marked (3)**
    8:13;31:12;42:1
**Market (1)**
    28:16
**may (4)**
    12:14;15:20,22;
    21:14
**maybe (1)**
    7:1
**McDERMOTT (15)**
    5:15,17;20:8;
    23:23;28:23;29:1;
    33:14;35:19;37:14;
    38:20;39:1,23;41:8,
    19;44:3
**mean (9)**
    16:24;20:6,9;
    27:23,24;31:22;
    32:21;34:1;36:5
**medication (1)**
    7:8
**medium (2)**
    18:4,4
**meet (1)**
    38:4
**memory (1)**
    23:15
**Michael (1)**
    5:17
**mind (2)**
    7:3;28:1
**minute (1)**
    38:21
**minutes (1)**
    24:1
**mixture (1)**
    20:1
**month (2)**
    6:3;7:18
**more (2)**
    36:15,17
**Mrs (5)**
    27:11;31:1;33:20;
    36:3;40:23
**much (1)**
    36:11
**Multiple (2)**
    37:18,19

**N**

**NA (2)**
    18:14,15
**name (5)**
    5:16;9:3;17:20;
    18:1,1
**named (1)**
    5:19
**narcotics (1)**
    7:9
**narrative (1)**
    10:19
**negative (5)**
    11:12;28:7;31:21;
    32:5;40:8
**neighborhood (2)**
    19:13,16
**Neither (1)**
    38:15
**next (5)**
    6:3;7:18;23:21;
    25:8;32:14
**night (9)**
    8:22;9:16,19;
    11:19;21:12,21;35:1,
    1,1
**Nobody (1)**
    32:3
**normal (1)**
    7:23
**North (12)**
    10:4;11:18;19:14;
    25:21;29:8;33:4;
    34:6,10;42:11,22;
    43:7,11
**northbound (4)**
    13:21;29:13,17;
    31:7
**noticed (1)**
    9:9
**number (1)**
    18:12

**O**

**Objection (5)**
    28:21;33:11;37:13;
    41:4,15
**objections (1)**
    5:5
**observed (7)**
    11:4,7;25:20;26:8;
    29:9;43:15,20
**obviously (1)**
    15:19
**Occupation (1)**
    18:14
**occurred (2)**
    12:14;33:3
**occurrence (1)**
    33:3

**off (9)**
    10:20;14:7;15:24;
    18:11;27:4,19;30:10;
    35:9;37:3
**off-duty (1)**
    38:23
**offender (2)**
    11:5,7
**Office (1)**
    8:20
**OFFICER (20)**
    5:9,16;6:2;7:14,17;
    8:1,23;12:15;15:14;
    16:12,15;17:3;19:6;
    24:19;27:7;31:16;
    37:8;39:5;40:4;41:23
**often (1)**
    28:14
**old (1)**
    15:17
**once (6)**
    5:16;27:19;30:7;
    31:1;32:18;41:16
**one (19)**
    5:19;13:18;14:23,
    24;15:7,24;27:8;
    28:18;29:2,14;32:2;
    36:15,17;38:20;
    42:16,16,17;43:2,2
**one-way (2)**
    42:14,21
**only (3)**
    28:18;33:6;39:18
**onto (1)**
    25:15
**operating (1)**
    41:24
**opportunity (1)**
    39:3
**out (12)**
    9:22;12:7;16:14,
    20;21:14,16,18;23:4,
    7,18;25:5;30:22
**over (6)**
    9:10;14:8;16:18;
    22:22;23:1;33:19

**P**

**PA (2)**
    18:9,16
**paperwork (3)**
    9:3,5;10:11
**partner (5)**
    8:1;12:3,8;31:16;
    41:23
**past (2)**
    13:19,21
**patrol (2)**
    8:9;12:6;20:3,10
**patrolled (1)**
    19:20
**patrolling (2)**

    8:4;9:21
**people (6)**
    19:23;20:2,11,13;
    32:23;37:16
**perpendicular (1)**
    43:4
**person (5)**
    12:5;16:22;21:9,
    22;33:7
**personnel (2)**
    12:3;32:1
**Philadelphia (7)**
    7:13;15:14;17:18;
    18:8,15;35:10;40:4
**phone (3)**
    20:21;21:3,6
**photo (1)**
    9:6
**physical (2)**
    19:4;33:15
**picture (1)**
    9:11
**Place (1)**
    18:15
**placed (3)**
    11:10;27:9;28:9
**play (1)**
    37:6
**pm (3)**
    21:17,19;44:9
**point (6)**
    9:22;28:8,11;
    31:24;32:2,21
**police (25)**
    6:1;7:13,16;8:13;
    10:22;11:4,6,11;
    12:3;14:8;15:6,14;
    22:6,22;23:1;27:20;
    31:12;32:1;33:19;
    35:5,10;40:4;41:23;
    42:1;43:20
**Poplar (1)**
    7:22
**precinct (3)**
    32:17,23,24
**prepare (1)**
    19:2
**prepared (8)**
    10:7,11;14:23,24;
    15:8,21,22;16:1
**preparing (1)**
    15:10
**primarily (1)**
    19:19
**printing (1)**
    10:15
**prior (1)**
    37:7
**probable (6)**
    35:5,7,12,20;36:12,
    19
**processing (1)**
    28:11

**progress (3)**
    10:3;11:1;42:2
**property (2)**
    11:9;26:9
**prosecution (2)**
    38:11,18
**provided (1)**
    22:6
**pull (1)**
    24:22
**pulled (1)**
    25:7
**purposes (1)**
    31:4
**pushing (2)**
    24:12;28:3
**put (6)**
    14:18;25:4;27:6;
    28:2;40:15,22

**Q**

**quick (3)**
    27:15,16,17

**R**

**R/C (1)**
    10:22
**radio (15)**
    8:19;9:22;10:2,23;
    14:8;22:7,11,22;
    23:1;27:20;29:7;
    33:19,24;34:13;42:1
**reach (1)**
    32:13
**read (3)**
    6:4;10:20;18:11
**reading (4)**
    21:5;25:18;38:24;
    43:23
**really (1)**
    35:17
**reason (3)**
    15:6;35:24;39:15
**reasonable (1)**
    40:20
**recall (54)**
    6:21,23;7:1;8:24;
    9:1,20;11:21;12:18,
    20;13:15;14:15,17,
    24;17:15;20:18;
    22:10,13,17;24:8,11,
    13,24;25:7,9,24;
    26:15,17,20,23;27:2,
    4,16;29:19,22;30:8,
    10,24;31:6;32:18;
    34:17,21,23,24;35:2,
    17;37:24;38:3;40:2;
    41:9,10,17;42:10,17;
    43:24
**received (2)**
    10:22;42:1

Case: 16-1874   Document: 003112405483   Page: 118   Date Filed: 09/12/2016

DURANT TYRONE TISDALE v.
CITY OF PHILADELPHIA- LAW DEPARTMENT, et al.

OFFICER TIMOTHY GIBSON
January 14, 2016

recognize (4)
  9:13,15;16:6,11
recollection (3)
  17:11,12;35:15
record (1)
  15:3
recorder (2)
  8:20;31:17
refer (3)
  20:24;21:13;25:17
reference (5)
  5:21;9:23;19:6;
  28:13;43:7
referred (1)
  16:3
referring (1)
  10:5
relatively (2)
  27:15,17
relevant (1)
  38:19
rely (1)
  33:7
remember (13)
  6:22;9:3;26:10;
  27:16,17;31:7,23;
  32:2,15;34:11;41:6;
  43:1,10
remembered (1)
  24:3
report (5)
  14:19;16:4,7;
  17:19;19:2
reported (1)
  20:20
represent (1)
  5:17
reserved (1)
  5:6
residence (1)
  18:7
residential (2)
  19:18,19
responding (1)
  29:7
results (5)
  11:13;28:7;31:21;
  32:5;40:8
reviewing (1)
  10:10
right (16)
  6:12;9:7;10:1;
  19:21;20:23;22:16;
  28:19;29:16;30:2,3,
  21;32:12;33:2;34:4;
  42:3,13
right-hand (1)
  30:5
routes (2)
  13:14,14
rules (1)
  6:10
run (2)

42:16,24
runs (4)
  29:13,16;42:12,15

S

same (3)
  6:11;8:12,15
saw (10)
  13:4,23;20:23;
  26:1,11;29:23;30:17;
  31:2;37:1;40:11
saying (3)
  12:13;26:10;37:16
scene (3)
  12:10;25:15;39:13
sealing (1)
  5:3
search (1)
  12:9
searching (2)
  12:17,19
seat (1)
  31:17
Security (1)
  18:12
seeking (1)
  6:22
sense (3)
  40:10,13,21
service (1)
  15:13
shirt (7)
  11:4;14:12,14;
  22:10;33:18;37:11;
  42:6
shopping (3)
  24:12;28:2;31:5
SHOTLAND (14)
  20:4;23:20;28:21;
  33:11;35:14;37:13;
  38:15,22;39:6,11,18;
  41:4,15;44:5
show (1)
  16:2
side (1)
  30:10
signing (1)
  5:3
single (1)
  18:6
site (1)
  27:13
sitting (1)
  10:9;17:12;30:20
situation (2)
  12:12,13
six (3)
  6:3;7:18;15:16
Social (1)
  18:12
somebody (4)
  17:7;37:10,16;

40:19
Sometimes (4)
  8:8,8;15:23,24
somewhere (2)
  25:11;40:6
sorry (7)
  6:20;14:1,11;
  16:21;17:10;22:23;
  43:18
south (3)
  42:11,22;43:11
spent (2)
  36:12,19
spoke (2)
  20:20;39:12
spot (5)
  18:17,21;19:17,18;
  34:19
start (2)
  11:14;25:5
state (3)
  15:1;26:21,24
stated (10)
  11:6;25:19;26:7,8;
  27:3;29:13;32:4;
  33:20;34:8;43:20
statement (4)
  28:8;33:9;36:3;
  41:20
states (1)
  10:18
stating (1)
  14:19
station (1)
  23:8
stenographer (2)
  6:11,16
Stewart (2)
  20:19;38:4
still (1)
  40:20
stipulated (1)
  5:1
stole (3)
  28:2;33:8;40:5
stop (5)
  14:4;24:23;25:5;
  27:18;30:24
stopped (14)
  14:5,22;15:6,7;
  22:1;24:15,24;25:18;
  27:12;30:9,13;31:1;
  33:17;34:3
straight (1)
  13:19
Street (20)
  13:9,13;18:8;
  21:10,23;23:7,10;
  28:15,16;29:9,12,16,
  18;30:12;31:8,24;
  37:11;43:5,16,22
streets (2)
  42:14,21

support (1)
  33:16
Sure (5)
  16:5;21:1,14;
  28:17;41:21
survey (5)
  26:16;29:5;31:4,
  10;32:4
surveyed (7)
  11:12;28:6;29:2;
  31:20;32:1;40:7;
  43:14
Susquehanna (1)
  34:10
sweating (1)
  34:22
switched (1)
  16:24
sworn (2)
  5:10;6:12

T

talk (4)
  12:17;21:2,6;28:13
talking (4)
  9:4;12:7;25:5;
  28:18
telling (4)
  24:14;31:2;37:1;
  43:24
testified (2)
  5:11;6:7
testify (1)
  37:23
Thanks (2)
  39:5;41:22
theft (4)
  10:3;11:1,16;42:2
thinking (2)
  17:14;27:21
three (4)
  31:6;35:2;37:7;
  41:12
times (4)
  28:12;37:15,18,19
TIMOTHY (1)
  5:9
T-I-P (1)
  10:23
Tisdale (15)
  5:18;8:23;9:24;
  14:13;16:17;17:8;
  22:1;24:6,9,15;25:19,
  20;26:18;32:16;
  34:20
Tisdale's (2)
  9:6;38:8
today (3)
  5:21;7:11;17:12
together (1)
  8:16
told (4)

5:22;26:5;28:1;
  32:22
took (2)
  28:9;33:4
tools (1)
  24:9
top (1)
  27:5
tour (1)
  7:23
towards (1)
  26:3
training (5)
  35:4;36:8,21,24;
  37:3
transport (1)
  17:7
transported (7)
  11:11;16:16,18;
  17:1,2,13;32:19
transporting (1)
  16:15
transports (1)
  16:22
traveling (1)
  29:8
trial (1)
  5:7
trolley (1)
  13:14
true (1)
  8:12
trying (1)
  17:2
turn (1)
  30:6
turned (2)
  19:5;30:9
two (1)
  38:23

U

under (2)
  11:10;12:5
uniform (4)
  24:17,19;25:10;
  41:24
unusual (2)
  21:8,22
up (8)
  13:18;17:1;24:22;
  25:7,19;27:15;30:2;
  31:2
Upon (1)
  43:19
use (2)
  10:23;11:1
used (1)
  7:8
usually (1)
  16:22

Case: 16-1874    Document: 003112405483    Page: 119    Date Filed: 09/12/2016

DURANT TYRONE TISDALE v.
CITY OF PHILADELPHIA- LAW DEPARTMENT, et al.

OFFICER TIMOTHY GIBSON
January 14, 2016

## V

**vehicle (4)**
8:9,14;31:13;42:1

## W

**wait (2)**
6:14;16:21
**waived (1)**
5:4
**walked (1)**
32:11
**walking (15)**
12:20;13:2,11,24;
14:3;21:9,22;26:3;
27:15;29:21;30:23;
31:23;32:2,10;37:10
**warm (1)**
35:1
**way (5)**
9:10;10:7;20:15;
29:14;41:1
**wearing (6)**
14:10,13,16,19;
15:2;42:6
**week (1)**
36:17
**weeks (3)**
36:10,11,18
**weight (2)**
17:21;22:15
**west (7)**
13:2;18:8;42:12,
15,17;43:1,2
**westbound (2)**
13:11;29:21
**what's (3)**
16:2;22:21;28:22
**Whereupon (1)**
44:8
**whichever (1)**
27:8
**white (14)**
11:4,7;14:11,11,16,
20;19:24;20:13,16;
22:10;33:18;37:12;
42:7;43:21
**Whittaker (9)**
8:2,21,23;12:15;
17:4;24:19;27:7;
31:16;41:24
**Whittaker's (1)**
16:12
**whole (1)**
41:1
**window (3)**
11:8;25:4;43:22
**within (1)**
23:24
**without (1)**
37:17

**witness (20)**
11:5,6,17;12:2,7;
14:1;16:19;17:1;
20:6;21:5;23:22;
25:18;33:13;35:16;
40:11;41:13,16;
43:16,19;44:6
**witness' (1)**
28:8
**work (1)**
7:6
**working (2)**
8:16;41:23
**worn (1)**
18:19
**write (4)**
6:4;22:18,21,24
**wrote (2)**
23:9,24

## Y

**years (6)**
6:3;7:18;15:16;
31:7;35:3;37:7
**years' (1)**
41:12
**York (3)**
13:17;34:9;43:13

## 1

**100 (1)**
28:15
**1000 (12)**
11:5;12:20;13:3;
19:9;21:10;28:15,19,
20;30:12;43:8,17,18
**10a (1)**
8:3
**10p (1)**
8:2
**10th (6)**
7:22;34:11;42:7;
43:6,12,13
**11 (1)**
43:7
**11:02 (5)**
21:17,19;34:15,16,
18
**11:05 (1)**
34:14
**11:25 (1)**
23:22
**1100 (1)**
29:10
**11000 (1)**
43:16
**11th (12)**
13:9,13,17;25:1;
29:8,12,16,18;30:11;
31:8;34:9;43:5
**185 (1)**

**18:3**

## 2

**20 (1)**
23:24
**2013 (3)**
8:11;15:20;19:21
**2100 (1)**
10:4
**2200 (6)**
19:14;34:5,9;
40:14;42:2;43:7
**2220 (4)**
11:18;25:21;33:4;
43:22
**229 (1)**
16:3
**24 (1)**
7:9
**27 (1)**
7:20

## 3

**3:15 (1)**
44:9
**301 (1)**
18:8
**33 (3)**
36:10,11,18
**39th (1)**
18:7

## 4

**48 (11)**
10:5,7,11,18;
21:16;22:3,19;23:4,
18;34:15,17
**48A (4)**
14:21,23;15:4,5
**48As (1)**
15:10
**48s (1)**
23:11

## 5

**5th (4)**
8:11;15:19;19:21;
21:18

## 6

**6 (1)**
8:3
**6p (2)**
8:2,3

## 8

**8th (1)**

**34:12**

## 9

**9th (2)**
34:11,12

**INVESTIGATION INTERVIEW RECORD**

**PHILADELPHIA POLICE DEPARTMENT**
EAST DETECTIVES

| | | |
|---|---|---|
| **CASE#** | | |
| **INTERVIEWER:** DET SHERWOOD #714 | | |

**NAME**
Brenda Lee
**ADDRESS**
2216 Delhi Street
**NAME OF EMPLOYER / SCHOOL**

**AGE**
52
**APT#**

**RACE/SEX**
B/F

**DOB**
4/26/61
**PHONE#**
267 716 1565
**SS#**

**ADDRESS OF EMPLOYER / SCHOOL**

**PHONE#**

**DATES OF PLANNED VACATION / BUSINESS TRIPS**

**NAME OF CLOSE RELATIVE**

**RELATIONSHIP**

**ADDRESS OF RELATIVE**

**PHONE#**

**PLACE OF INTERVIEW**
EDD
**BROUGHT IN BY**
Self
**WE ARE QUESTIONING YOU CONCERNING:**
theft.
**WARNINGS GIVEN BY:**

| | |
|---|---|
| **DATE** 7/6/13 | **TIME** 1220a |
| **DATE** 7/6/13 | **TIME** 1200a |
| **DATE** | **TIME** |

**ANSWERS:**

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q. What happened tonight that brings you here?
A. I was at my front of my house at 2216 Delhi Street and I seen a male bending down at my neighbors house and I noticed a shopping cart on the sidewalk. I grabbed my phone and went outside as the male was walking away with the shopping cart. I noticed that my neighbors cellar window grate was missing. I called 911 and gave a description of the male. I then followed the male in my car and stayed on the phone with 911. The police stopped the male at 11ᵗʰ and Arizona Street and I told the police that that is the male that stole the window grate. The male did not have the grate on him when the police stopped him.

Q. What is your neighbors address?
A. 2220 Delhi Street. It's my cousins house.

Q. Can you describe the male?
A. B/M wearing a white hat turned backwards, black pants and a black shirt.

Q. Had you seen him before?
A. No.

Q. What is your neighbors name?
A. Brian Stewart. He is my cousin.

Q. Was your neighbor home?
A. No.

Q. Have you spoke to Brian tonight?
A. Yes.

Q. Did he give the male permission to take the grate?
A. No.

Q. Is there anything else you want to add to this interview?
A. No.

7-6-13

*Brenda Lee*

| **RECORD** YES NO | **CHECKED BY:** |
|---|---|
| **REVIEWED BY:** | |

75-463

A 119

# BIOGRAPHICAL INFORMATION REPORT

☒ **ARREST**    ☐ **INVESTIGATION**    ☐ **OTHER**

*(CHECK BLOCKS WHERE DOCUMENTATION EXISTS)*

**PHILADELPHIA POLICE DEPARTMENT**

| DATE 2-5-13 | TIME 1:40 pm | LOCATION OF INITIAL CONTACT 1000 Arizona | DISTRICT 22 | D.C. NO. 13-26-033674 |

| NAME | LAST Durant | FIRST Tisdale | MIDDLE | D.O.B. 2-2-60 | SEX m | RACE Blck |

| HEIGHT 5'9 | WEIGHT 185 | HAIR COLOR Grey | EYE COLOR Brn | COMPLEXION Med | BUILD Med | GLASSES (YES/NO) no | FACIAL HAIR Gotee |

| NICKNAME no | ALIASES no | MARITAL STATUS Single |

| RESIDENCE STREET NUMBER/NAME 301 W. eric st | CITY/STATE (OTHER THAN PHILA.) Phila, Pa | DIST 59 |

| TYPE OF RESIDENCE House | RESIDES WITH Alone | DRIVER NUMBER | STATE |

| SOCIAL SECURITY NUMBER 201320701 | OCCUPATION Na | EMPLOYER/ADDRESS NA |

| PLACE OF BIRTH/CITY, STATE Phila, Pa | GROUP AFFILIATION | ETHNIC BACKGROUND |

| SCARS, TATTOOS, DEFORMITIES | CLOTHING DESCRIPTION | JEWELRY WORK |

## VEHICLE INFORMATION

| | YEAR | MAKE | MODEL | COLOR | STATE | TAG | VIN |
|---|------|------|-------|-------|-------|-----|-----|
| 1. | | | | | | | |
| 2. | | | | | | | |

| | OWNER-LAST NAME, FIRST | ADDRESS | CITY | STATE |
|---|------------------------|---------|------|-------|
| 1. | | | | |
| 2. | | | | |

| MODUS OPERANDI *(METHODS, TRAITS, ETC.)* | AREAS FREQUENTED |
|------------------------------------------|------------------|
| | |

75-229 (Rev 3-92)

AREAS MARKED WITH ➤ MUST BE FILLED IN.
CHECK RELIABILITY BOXES WHEN APPROPRIATE

A-120

6

**CERTIFICATE OF SERVICE**

I do hereby certify that on September 12, 2016, a copy of the foregoing was filed

electronically. Notice of the filing will be sent to all parties by operation of the Court's

electronic filing system.   Parties may access this filing through the court's system:

Served by electronic filing to:

> Aaron Shotland, Esquire
> Assistant City Solicitor
> City of Philadelphia Law Department
> 1515 Arch Street, 5th Floor
> Philadelphia, PA 19102

> *Michael I. McDermott*
> Michael I. McDermott, Esquire
> Attorney Identification No.: 52917
> Attorney for Appellant, Durant T. Tisdale
> 1026 Winter Street, Suite 200
> Philadelphia, PA 19107
> (215) 925-9732

Dated: September 12, 2016